937 F.2d 1450
 60 USLW 2057, 13 Employee Benefits Ca 2545
 Duane ABLAMIS, Trustee of the RBJ Auto Parts Distributors,
Inc. Profit Sharing Trust and the A & M Motor
Supply, Inc. Profit Sharing Trust,
Plaintiff-Appellee,
v.
Gay M. ROPER, Executor of the Estate of Glee Ann Ablamis,
Defendant-Appellant.
 No. 89-15352.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted April 19, 1990.
Decided July 3, 1991.
 
 Arthur H. Bredenbeck, Keith P. Bartel, Kevin F. Kouba, Carr, McClellan, Ingersoll, Thompson & Horn, Burlingame, Cal., Robert E. Temmerman, Jr., Campbell, Cal., for defendant-appellant.
 Harry J. Kaplan, David K. Pansius, San Jose, Cal., for plaintiff-appellee.
 Appeal from the United States District Court for the Northern District of California.
 Before LIVELY,* FLETCHER and REINHARDT, Circuit Judges.
 REINHARDT, Circuit Judge:
 
 
 1
 We are asked to decide here whether a wife who dies while her husband is still living may leave half his current or future pension benefits to a third party in her will. We hold that an employee whose pension interests are covered by ERISA may not be so divested of his entitlement.
 
 
 2
 In the case before us, Gay M. Roper, executrix of the estate of Glee Ann Ablamis (Executrix), appeals the decision of the district court granting summary judgment to Duane Ablamis, trustee for the RBJ Auto Parts Distributors, Inc. Profit Sharing Trust ("RBJ") and the A & M Motor Supply, Inc. Profit Sharing Trust ("A & M") (Trustee). These trusts are part of the retirement plans maintained by the two companies. The district court found, inter alia, that the Employee Retirement Income Security Act of 1974, 88 Stat. 829, as amended (ERISA), 29 U.S.C. sections 1001 et seq., preempts any state community property law which arguably provides a predeceasing nonemployee spouse with a testamentary interest in a fully vested surviving employee spouse's pension benefits. We affirm.
 
 I. FACTS
 
 3
 Glee Ablamis (Ms. Ablamis) and Roger Ablamis (Mr. Ablamis) were married on August 6, 1972. Their marriage continued until Ms. Ablamis's death on February 1, 1988.
 
 
 4
 Mr. Ablamis became a participant in the A & M retirement plan on July 1, 1968 and a participant in the RBJ retirement plan on August 1, 1973. Both plans are employee benefit profit sharing plans subject to the provisions of ERISA. Mr. Ablamis's interest in both plans was 100% vested at the time of Ms. Ablamis's death.
 
 
 5
 In 1987, Ms. Ablamis executed a will. The will left the majority of her estate to two trusts: one for her children of a previous marriage, and the other for the maintenance of her spouse, with a remainder to her children. Ms. Ablamis devised "all property subject to [her] testamentary power including [her] one-half ( 1/2) community property interest in all community assets and any separate property assets [she] may have."
 
 
 6
 The trustee of the retirement plans brought this action in federal district court because Ms. Ablamis's estate claimed a community property interest in Mr. Ablamis's vested rights in both plans. The parties filed cross-motions for summary judgment.[1] While the trustee sought a declaratory judgment that Ms. Ablamis's estate is not entitled to any interest in Mr. Ablamis's pension benefits, the executrix of Ms. Ablamis's estate sought a declaratory judgment that the estate is entitled to a one-half community property interest.
 
 
 7
 The district court granted summary judgment in favor of the trustee, finding that (1) California's community property laws do not allow a nonparticipant spouse to bequeath her interest in a participant spouse's retirement plan; and (2) the Retirement Equity Act of 1984 preempts any state law which arguably grants a nonparticipant spouse such an interest.[2] The executrix of Ms. Ablamis's estate appeals the district court's judgment. We need consider only the preemption question to resolve this dispute.
 
 II. DISCUSSION
 A. Statutory Background
 
 8
 Prior to the enactment of ERISA, many persons who had worked all their lives with the expectation of receiving income during their retirement years found themselves deprived of their pensions because of the absence of minimum standards protecting pension plan funds. Congress enacted ERISA to provide such protection and thus ensure "the continued well-being and security of millions of employees and their dependents" who rely upon retirement plans. H.R.Conf.Rep. No. 93-1280, at 7 (1974), U.S.Code Cong. & Admin.News 1974, p. 4639. Although ERISA consistently referred to either "employees and their beneficiaries" or "employees and their dependents" in its policy declaration, see 29 U.S.C. section 1001(a) (1982), the statute failed to delineate clearly a spouse's interest in an employee's pension benefits. The statutory confusion often left women who worked in the home and contributed significantly to the family's financial security without the ability to obtain any pension benefits upon their husbands' death or upon divorce. Accordingly, Congress passed the Retirement Equity Act of 1984 (REA), Pub.Law 98-397, 98 Stat. 1426, to afford better protection to women "dependent on ... [their] husband[s'] earnings and at the mercy of death or divorce." Pension Equity For Women: Hearings on H.R. 2100 Before the Subcomm. on Labor-Management Relations of the Committee on Education and Labor, 98th Cong., 1st Sess. 26 (1983) (statement of Hon. Geraldine Ferraro). In other words, REA amended ERISA in an effort primarily to safeguard the financial security of widows and divorcees. See Mackey v. Lanier Collections Agency & Service, 486 U.S. 825, 108 S.Ct. 2182, 2189-90, 100 L.Ed.2d 836 (1988) (stating that "the primary focus of [the qualified domestic relations exception][3] was removing section 206(d)(1)'s anti-garnishment protection from pension plan benefits when spouses sought enforcement of domestic support orders ..."); Gabrielson v. Montgomery Ward & Co., 785 F.2d 762, 765 (9th Cir.1986) (asserting that Congress amended section 1055 "to enlarge rights of surviving spouses to receive benefits."); Heisler v. Jeep Corporation-UAW Retirement Income Plan, 807 F.2d 505, 509 (6th Cir.1986) (concluding that the REA sought to rectify certain inequities "by providing for 'automatic survivor benefits to the spouses of vested participants.' ") (quoting S.Rep. No. 575, 98th Cong., 2d Sess. 12, reprinted in 1984 U.S.Code Cong. & Ad.News 2547, 2558).
 
 
 9
 The REA specifically afforded protection to widows (and widowers)[4] by requiring pension plans to provide automatic survivor benefits. 29 U.S.C. section 1055.[5] Once a participant becomes vested under the plan--that is, has earned a nonforfeitable right to any portion of his accrued benefit--his spouse is assured of receiving a survivor's annuity if her husband predeceases her; the plan administrator must pay the surviving spouse, on the participant's death, at least 50% of the participant's benefit.[6] The survivor annuity may be waived only if the waiver is in writing and signed by the participant and the participant's spouse. 29 U.S.C. Sec. 1055(c)(1) On the death of the surviving spouse the survivor annuity terminates. It cannot be bequeathed. Moreover, with one extremely important but limited exception which we will discuss shortly, a spouse cannot receive any pension benefits directly until after the death of the plan participant; during the participant's lifetime the REA requires the plan administrator to pay the entire pension benefit to the former employee.
 
 
 10
 To secure the financial well-being of employees and their dependents, ERISA contains a spendthrift provision. That provision states that the "benefits provided under the [retirement] plan may not be assigned or alienated." 29 U.S.C. section 1056(d). In Guidry v. Sheet Metal Workers National Pension Fund, 493 U.S. 365, 110 S.Ct. 680, 107 L.Ed.2d 782 (1990), the United States Supreme Court asserted that any exceptions to the anti-alienation provision must be expressly mandated by Congress.[7] Guidry concluded that ERISA's prohibition on the assignment or alienation of pension benefits "reflects a considered congressional policy choice, a decision to safeguard a stream of income for pensioners (and their dependents ...), even if that decision prevents others from securing relief for the wrongs done them. If exceptions to this policy are to be made, it is for Congress to undertake that task." Id. 108 S.Ct. at 687 (footnote omitted). Thus, in the absence of an exception--and Congress has made none regarding survivor annuities--a surviving spouse may not alienate her own survivor's benefits during her lifetime, let alone a portion of her husband's benefits during his. Congress did make one important exception, however. As we have noted, Congress was also concerned with the inequities that might be suffered by women who are the economic victims of divorce or separation. To protect their interests, the REA creates an express statutory exception to the prohibition on assignment and alienation in the case of distributions made pursuant to certain state court orders: ERISA's spendthrift provisions are not applicable to a "qualified domestic relations order" (QDRO). A court may divide spousal rights in pension benefits through the mechanism of a QDRO and award the non-employee spouse her appropriate share of those benefits--but only if the domestic relations order is a "qualified" one as defined in the REA.
 
 
 11
 Under REA, a QDRO is any judgment, decree, or order made pursuant to a state domestic relations law (including community property law) which (1) "creates or recognizes the existence of an alternate payee's right to, or assigns to an alternate payee the right to, receive all or a portion of the benefits payable with respect to a participant under a plan," and (2) "relates to the provision of child support, alimony payments, or marital property rights to a spouse, former spouse, child, or other dependent of a participant." 29 U.S.C. section 1056(d)(3)(B). Only "qualified" domestic relations orders are exempt from ERISA's spendthrift provisions; other domestic relations orders are expressly made subject to the anti-assignment provision and are, as a result, preempted. See 29 U.S.C. section 1056(d)(3)(A); S.Rep. No. 98-575 at 19, 1984 U.S.Code Cong. & Ad.News at 2565. As the Senate Report states:
 
 
 12
 There is a divergence of opinion among the courts as to whether ERISA preempts State community property laws insofar as they relate to the rights of a married couple to benefits under a pension, etc., plan. [p] The committee believes that the spendthrift rules should be clarified by creating a limited exception that permits benefits under a pension, etc., plan to be divided under certain circumstances.... [T]he committee believes that conforming changes to the ERISA preemption provision are necessary to ensure that only those orders that are excepted from the spendthrift provisions are not preempted by ERISA.
 
 
 13
 S.Rep. No. 98-575 at 19, 1984 U.S.Code Cong. & Ad.News at 2565 (emphasis added) (footnote omitted). Thus, in the case of QDROs the REA provides a "limited exception" to the anti-assignment provision for certain specified types of domestic relations property allocations. Because orders providing for such allocations are not subject to the anti-assignment provision, no preemption issue arises as to them.
 
 
 14
 Here, the executrix relies primarily on the QDRO exception. She does not contend that any other exception permits Ms. Ablamis to bequeath to her children by a former marriage a portion of the amounts which Mr. Ablamis would ordinarily receive during his retirement under his benefit plans. She does argue, however, that wholly aside from the QDRO exception, the anti-assignment provision has no applicability at all to the entire subject of transfers of pension interests among family members and their dependents or heirs. We discuss those arguments below. It is worth noting, however, that nothing in the record suggests that Ms. Ablamis had a specific intention to transfer part of Mr. Ablamis's pension interests or benefits to her children. In her will, Ms. Ablamis sought only to bequeath her "community" and "separate" property to two trusts. It is Ms. Ablamis's executrix who has asserted that the term "community property" includes a one-half interest in Mr. Ablamis's pension rights and that those rights therefore pass under the terms of the will.
 
 B. Analysis
 
 15
 Ms. Ablamis's executrix contends, first, that under California law Ms. Ablamis has the right to make a testamentary transfer of one-half of Mr. Ablamis's pension rights. Next, she argues that the Probate Court order accomplishing that transfer constitutes a QDRO. We have not previously been required to consider the question whether state law may authorize a pre-deceasing spouse to bequeath a purported community property interest in her surviving employee spouse's pension rights to third parties. We assume for purposes of this opinion that California law authorizes such a bequest, although our assumption should in no way be taken to imply an opinion that it actually does so.[8]
 
 
 16
 Initially, we determine that ERISA's express statutory language and legislative history make it clear that Congress did not intend to classify state court orders effecting testamentary transfers as QDROs. Such transfers are simply not among the limited exceptions to the anti-alienation provision that were enacted by Congress. Two of the three categories of excepted payments--child support and alimony--clearly are not testamentary in nature. The statutory language also makes it clear that the third category--allocation of marital property rights--like the first two applies exclusively to inter vivos distributions. REA provides expressly that while state courts may issue a QDRO on behalf of an "alternate payee," and may afford marital property rights to such a payee, only a "spouse, former spouse, child, or other dependent of a participant" qualifies as a recipient under the statute. 29 U.S.C. section 1056(d)(3)(K). Ms. Ablamis's estate does not qualify as an "alternate payee" under REA. An estate, even of a deceased spouse, certainly does not fall within even the most liberal construction of the phrase "spouse, former spouse, child or other dependent of the participant."
 
 
 17
 Similarly, Ms. Ablamis's death divests her of the title of "spouse or other dependent." The Executrix argues that the term "former spouse" encompasses a deceased nonparticipant spouse. In legal parlance, however, the term "former spouse" does not include a deceased spouse. At law, we use the term "former spouse" to refer not to a spouse who has died, but to a divorced spouse; once a spouse has died we refer to her, for legal purposes, as a "deceased spouse." Nothing in the language or the legislative history of REA suggests an intention to afford the term "former spouse" a meaning different from its customary usage.
 
 
 18
 Thus, the category of orders to which the QDRO exception explicitly applies belies the contention that a probate court may order a plan administrator to pay pension benefits to a deceased spouse's estate. The limited QDRO exception applies only to "domestic relations" orders "made pursuant to a state domestic relations law," not to "probate" orders or orders made pursuant to probate law. Domestic relations orders deal with household or family matters, which include divorce, separation, custody, support and adoption.[9] Conversely, probate orders seek to distribute resources upon the event of death; they concern the establishment of wills and the settlement of decedents' estates.[10] We are bound by the specific use of the term "domestic relations" and the notable failure to include the term "probate" in section 1056(d). If Congress had intended to create an exception to the prohibition on alienation that would permit a deceased spouse to bequeath her purported interests in a surviving employee's pension benefits to a third party, it would undoubtedly have expressly excepted probate orders in addition to domestic relations orders.[11] Alternatively, it could have expanded its exception to include not only transfers pursuant to QDROs but also all transfers pursuant to or in conformity with state domestic relations laws. In such case, pension benefits might have become community property for all purposes and might have been subject to being lawfully bequeathed by a predeceasing non-employee spouse. Congress expressly chose not to adopt either alternative. Instead, it provided that the transfer of pension rights would be permissible only under the limited circumstances set forth in its definition of a QDRO. That is a choice we are bound to respect.
 
 
 19
 As the legislative history underlying REA illustrates, one of Congress' primary purposes in enacting the limited exception to ERISA's prohibition on assignment and alienation was to safeguard the security of the employee's immediate family members in the case of divorce or separation. For that reason, only "qualified" orders are exempted. Orders relating to the provision of benefits to the non-employee spouse are, under specified circumstances, deemed "qualified"; orders transferring benefits from such a spouse to third parties are not. Here, we are presented with the latter type of order. Our conclusion is buttressed by the fact that Ms. Ablamis's estate does not seek a remedy that will effectuate either of the two primary statutory purposes. Her executrix does not seek to ensure the continued well-being and security of retirees or their family members by preserving their pension interests; nor does she seek to protect the rights of a former spouse or widow who may be dependent upon the employee spouse's earnings. Instead, she asks to have a significant portion of the pension benefits earned in the course of Mr. Ablamis's employment transferred to third parties during Mr. Ablamis's lifetime, and thereby seeks to divest Mr. Ablamis (and his immediate family members, if there are any) of any interest in those pension rights. That action clearly contravenes the language and purpose of ERISA and the QDRO exception. To the extent that state community property laws permit such transfers, they are preempted by section 1056(d).
 
 
 20
 As a matter of policy, ERISA's limited exception to the prohibition against assignment and alienation has considerable merit. Pensions are designed for the benefit of the living. Congress wanted to ensure that workers would have the security of a fair pension for their lifetimes. Congress also wanted surviving spouses to have what it considered to be a reasonable degree of security. In this connection, Congress wisely deemed it necessary to protect the divorced spouse for the remainder of her lifetime. From a practical standpoint, in order to do so, it was necessary to give her, upon divorce, the share of the pension benefits she would have been entitled to if she had remained married and her husband predeceased her. Since that interest is ordinarily converted into cash or other property at the time of the divorce, it followed necessarily that the divorced spouse would receive full right, title and interest in the settlement proceeds, and that she would therefore be free to bequeath any funds remaining at the time of her death to the beneficiary of her choice. However, Congress' fundamental purpose was evident throughout--to ensure that both spouses would receive sufficient funds to afford them security during their lifetimes, not to arrange for an opportunity for a predeceasing non-employee spouse to leave a part of her surviving husband's pension rights to others. We must keep in mind that pension benefits are designed to protect individuals in their later years--both the employee and the spouse. That the employee's ultimate pension will be reduced following divorce is unavoidable--because divorce necessitates the maintenance of two households rather than one. However, from the standpoint of pension protection--the fundamental purpose and goal of ERISA--there is no reason to allow a predeceasing non-employee spouse to leave part of her surviving employee spouse's pension to a friend, lover, or relative.[12] The provisions and legislative history of ERISA, as amended by REA, unmistakably compel the conclusion that Congress intended to prohibit non-employee spouses from making such bequests.
 
 
 21
 The executrix also argues that we need not examine the QDRO exception because ERISA's spendthrift provision is simply inapplicable to "allocations or transfers between spouses." She is clearly wrong. As demonstrated above, Congress created the QDRO exception to exempt from the spendthrift provisions certain domestic relations orders relating to specific assignments or alienations primarily between spouses. See 29 U.S.C. Sec. 1056(d)(3)(A) (stating that the spendthrift provision "shall apply to the creation, assignment, or recognition of a right to any benefit payable with respect to a participant pursuant to a domestic relations order, except ... if the order is determined to be a qualified domestic relations order".) Congress' determination that there was a need for a "QDRO exception" in itself provides strong evidence that the spendthrift provision does apply on its face to spousal assignments of pension benefits. If the dissent's argument were correct, it would have been unnecessary for Congress to amend ERISA to allow state courts to issue QDROs for divorce settlements and family support.[13] Far more compelling, however, is the fact that Congress specifically provided that certain types of domestic relations orders--those not constituting "qualified" orders--are subject to the anti-alienation provision. 29 U.S.C. Sec. 1056(d)(3)(A). This provision expressly confirms the applicability of the plain, all-encompassing general anti-assignment provision to all domestic relations (and other) transfers not subject to a specific statutory exception.[14] See Guidry, 110 S.Ct., at 680. Thus, it is readily apparent that transfers pursuant to state domestic relations laws or rules not exempted under the QDRO exception are governed by the anti-assignment provision. In enacting REA, Congress sought to clarify the law as to which spousal transfers were to be exempted. Congress chose to exempt some but not all such transfers. We therefore reject the contention that ERISA's prohibition against assignment and alienation does not apply to marital transfers in general.
 
 
 22
 Moreover, the United States Supreme Court has consistently held that spendthrift provisions do apply, in general, to transactions by and between spouses. See, e.g., Wissner v. Wissner, 338 U.S. 655, 70 S.Ct. 398, 94 L.Ed. 424 (1950); Hisquierdo v. Hisquierdo, 439 U.S. 572, 99 S.Ct. 802, 59 L.Ed.2d 1 (1979); Ridgway v. Ridgway, 454 U.S. 46, 102 S.Ct. 49, 70 L.Ed.2d 39 (1981); McCarty v. McCarty, 453 U.S. 210, 101 S.Ct. 2728, 69 L.Ed.2d 589 (1981); Rose v. Rose, 481 U.S. 619, 107 S.Ct. 2029, 95 L.Ed.2d 599 (1987); Mansell v. Mansell, 490 U.S. 581, 109 S.Ct. 2023, 104 L.Ed.2d 675 (1989). The Court has noted a possible narrow exception to the broad sweep of anti-alienation provisions in the case of alimony and child support, but has generally refused to extend this exception to other forms of community property divisions. See Rose, 107 S.Ct., at 2037. The alimony and child support exception rests upon the notion that "family support obligations are deeply rooted moral responsibilities, while the community property concept is more akin to an amoral business relationship." Id. (citing Wissner, 338 U.S., at 660, 70 S.Ct., at 400).[15] Accordingly, the Court has repeatedly held that community property claims, other than those relating to family support, cannot override a general anti-assignment provision in a federal statute and are preempted. See, e.g., Mansell, 109 S.Ct., at 2027-2030; Rose, 481 U.S., at 630-32, 107 S.Ct., at 2036-2037; McCarty, 453 U.S., at 230, 101 S.Ct., at 2740; Ridgway, 454 U.S., at 54-55, 102 S.Ct., at 54-55; Hisquierdo, 439 U.S., at 587, 99 S.Ct., at 811; Wissner, 338 U.S., at 659-60, 70 S.Ct., at 400.[16] Prior to the enactment of REA and the express establishment by statute of the limited QDRO exception we construe today, the Court by way of summary dismissal upheld the application of a similar, though, implied limited exception. In re Marriage of Campa, 89 Cal.App.3d 113, 152 Cal.Rptr. 362 (1st Dist.1979), appeal dismissed, 444 U.S. 1028, 100 S.Ct. 696, 62 L.Ed.2d 664 (1980); see Carpenters Pension Trust v. Kronschnabel, 632 F.2d 745 (9th Cir.1980). It dismissed for want of a substantial federal question an appeal from a California court decision allowing a court-ordered division of pension rights upon dissolution of a marriage. However, in no case did the Court or the Ninth Circuit ever suggest that any exception, implied or otherwise, went beyond the dissolution and support provisions covered by the QDRO exception to the REA or that testamentary transfers were covered by any such exception.
 
 
 23
 Here, Congress has gone further than the traditional family support exception and has provided an added exemption, similar to that recognized in Campa, in the case of a division of community property assets pursuant to a QDRO. Under section 1056(d), community property proceeds divided in connection with a decree of divorce, dissolution, or separation are excepted from the terms of the anti-assignment provision. Congress has not, however, adopted any comparable exception for testamentary dispositions of property, "community" or otherwise. Considering the purposes of ERISA and Congress' strong desire to afford economic protection to retired persons and their surviving spouses, present or former, its failure to do so is hardly surprising.
 
 
 24
 Given the specific language of ERISA, the legislative history of REA, and the Supreme Court's clear holdings regarding the applicability of anti-assignment provisions to spousal transfers, we have no doubt whatsoever that Sec. 1056(d) of ERISA is generally applicable to transfers involving spouses and necessarily preempts all orders relating to such transfers that do not fall within the specific and limited QDRO exception set forth in REA. Orders that do not qualify under that exception contravene the direct language of ERISA's anti-assignment provision. Permitting a non-employee spouse to bequeath one-half of a surviving employee's pension benefits to a third party would do "major damage," see Hisquierdo, 439 U.S., at 581, 99 S.Ct., at 808, to ERISA's objective of ensuring and strengthening pension benefits for retirees and their dependents.[17]
 
 III. CONCLUSION
 
 25
 In light of the express statutory language and congressional intent, we conclude that ERISA, as amended by REA, precludes the testamentary transfer by a deceased spouse of her purported community property interest in a surviving employee spouse's pension benefits. We need not address the question whether California community property laws or the terms of Mr. Ablamis's plans purport to grant such a right, as ERISA expressly preempts any state law or plan that contravenes its anti-assignment and -alienation provision. To the extent that California law permits the type of testamentary transfer at issue that law is preempted by section 1056(d). Under ERISA, an employee, active or retired, may not be deprived of any part of his pension benefits, current or prospective, as the result of a spouse's purported testamentary transfer of her asserted community property interest in such benefits. Accordingly, the district court's order granting summary judgment for the plaintiff trustee, and denying defendant executrix's cross-motion for summary judgment, is
 
 
 26
 AFFIRMED.
 
 FLETCHER, Circuit Judge, dissenting:
 
 27
 I respectfully dissent.
 
 
 28
 In enacting the Retirement Equity Act, Congress sought to "provide for greater equity under private pension plans for workers and their spouses and dependents by taking into account changes in work patterns, the status of the marriage as an economic partnership, and the substantial contribution to that partnership of spouses who work both in and outside the home," S.Rep. No. 98-575, 98th Cong.2d Sess. 1, reprinted in U.S.Code Cong. & Ad.News 2547 (1984). The Act recognizes that both the employee and non-employee spouse make substantial contributions to the economic partnership formed by marriage, and that both have an interest in the pension benefits of the employee. The majority's opinion turns the purpose of the Act on its head, somehow discerning within it an intent on the part of Congress to deprive the non-employee spouse of property rights in the pension granted her under state law. As amended by the REA, the majority tells us, ERISA would allow the employee spouse to bequeath his property interest in the pension plan to any third party he chooses; should the non-employee spouse seek to make a bequest of her property interest in the pension plan for the benefit of her children, however, the majority tells us, she would do "major damage" to the policies underlying ERISA. As a matter of law, policy, and common sense the decision cannot be justified.
 
 I.
 
 29
 Contrary to the doubt expressed by the majority as to whether state law authorizes a bequest by a spouse of her community property interest in her spouse's pension, California law clearly authorizes a bequest of the type at issue. The district court relied on California's "terminable interest rule" as a ground for barring the decedent's bequest. California, however, has both by legislative and judicial pronouncement reversed the terminable interest rule.
 
 
 30
 The California Supreme Court announced the terminable interest rule in Benson v. City of Los Angeles, 60 Cal.2d 355, 33 Cal.Rptr. 257, 384 P.2d 649 (1963), and explicated it in Waite v. Waite, 6 Cal.3d 461, 99 Cal.Rptr. 325, 492 P.2d 13 (1972). "Briefly stated, this judicially created rule recognize[d] that an interest in a retirement plan traceable to contributions of community funds or to community labor constitutes community property; however, the interest of the non-participant spouse does not extend to benefits payable after the death of either spouse." Chirmside v. Board of Administration, 143 Cal.App.3d 205, 208, 191 Cal.Rptr. 605 (1983) (footnote omitted). As laid out by the California Supreme Court, the rule consisted of two separate tenets. First, the terminable interest doctrine postulated that the community interest in accrued benefits did not survive the death of the employee spouse. Thus, the non-employee spouse could not claim any pension benefits accrued during the marriage if the employee spouse designated a third party to receive them after his death. Second, the terminable interest doctrine postulated that the non-employee spouse's interest terminated upon the death of the employee spouse, so that the non-employee spouse could not bequeath those benefits by will. See Bowman v. Bowman, 217 Cal.Rptr. 174, 176, 171 Cal.App.3d 148, 152 (1985) (citing Culhane, Terminable Interest Doctrine, 14 Sw.U.L.Rev. 613, 615-16 (1984)).
 
 
 31
 The terminable interest doctrine existed uneasily in California law for the next two decades as courts critical of its rationale either followed it with obvious reluctance, see, e.g., In re Marriage of Peterson, 41 Cal.App.3d 642, 115 Cal.Rptr. 184 (1974), or sought to elude the dictates of the rule by limiting its application to continually narrower factual circumstances, see, e.g., Bowman v. Bowman, 171 Cal.App.3d 148, 217 Cal.Rptr. 174 (1985); Chirmside v. Board of Administration, 143 Cal.App.3d 205, 191 Cal.Rptr. 605 (1983). Perhaps the California courts' discomfort with the terminable interest rule was best summed up in In re Marriage of Peterson, 41 Cal.App.3d 642, 115 Cal.Rptr. 184 (1974), in which the Court of Appeals commented, "We do not believe the rule which we must follow is fair. [Husband's] pension rights constitute a bundle to which [wife], as a partner in the community during the years of marriage contributed her equal share. Why should she be deprived of her right to any single stick in the bundle?" 115 Cal.Rptr. 184; see also Chirmside, 191 Cal.Rptr. at 607 ("The doctrine has been criticized by both legal commentators ... and the courts which must apply it.... The primary complaints include its patent unfairness to the non-employee spouse, its reliance on the implied repeal of statutes prohibiting the unilateral gift of community funds, and its failure to take into account the nature of the death benefits involved. All these criticisms have merit....") (citations omitted).
 
 
 32
 The California legislature stepped in to recognize the validity of the criticism of the terminable interest rule by adding Civil Code Section 4800.8, which empowers a court to issue "whatever orders are necessary or appropriate to assure that each party receives his or her full community property share in any retirement plan, whether public or private, and including all survivor and death benefits." Section 2, though uncodified, provides: "It is the intent of the Legislature to abolish the terminable interest rule as set forth in Waite v. Waite ... and Benson v. City of Los Angeles ... in order that retirement benefits shall be divided in accordance with Section 4800." (Stats.1986, ch. 686, Sec. 2, p. 471). Subsequent case law confirms that the "the much-criticized terminable interest rule has itself been terminated." In re Estate of MacDonald, 213 Cal.App.3d 456, 261 Cal.Rptr. 653, 656 (1989); see Estate of Austin, 206 Cal.App.3d 1249, 1253, 254 Cal.Rptr. 372, 373 (1988) ("the underlying premise ... that there is such a thing as a terminable interest has been legislatively abolished"); see also In re Marriage of Powers, 218 Cal.App.3d 626, 641, 267 Cal.Rptr. 350, 358 (1990) ("By abrogation of the terminable interest rule the Legislature affirmed the right of the non-employee spouse to what was his or hers by virtue of the community effort and eliminated a windfall profit to the employee spouse. This basic objective of the statute is not dependent on whether the non-employee spouse is living or dead at the time these rights accrue."). Consequently, "under section 4800.8, the community property interest of a non-employee spouse is now inheritable." Id., 267 Cal.Rptr. at 360.
 
 II.
 
 33
 Contrary to the majority's opinion, the non-employee spouse's community property interest in the pension that is created by California law poses no conflict with federal law that justifies preemption. The majority holds that ERISA preemption precludes the disposition of the property interest at issue in this case by the non-employee spouse based on its determination that the testamentary transfer of spouse's interest in a pension plan is not encompassed within the QDRO exception to ERISA's spendthrift provision. By construing the appellant's claim in this manner, the majority gives short shrift to the chief thrust of appellant's argument: that the QDRO issue need not be reached at all because California community property law does not create a fundamental conflict with ERISA's spendthrift provision. Appellant's argument is squarely on target.
 
 A.
 
 34
 The Supreme Court requires that the preemptive effect of ERISA be construed narrowly where state family-property law is at issue:
 
 
 35
 "The whole subject of domestic relations of husband and wife, parent and child, belongs to the laws of the States and not to the laws of the United States." On the rare occasion when state family law has come into conflict with a federal statute, this Court has limited review under the Supremacy Clause to a determination whether Congress has "positively required by direct enactment" that state law be preempted.... A mere conflict in words is not sufficient. State family and family-property law must do "major damage" to "clear and substantial" federal interests before the Supremacy Clause will demand that state law be overridden.
 
 
 36
 . . . . .
 
 
 37
 The approach must be practical.... The pertinent questions are whether the right as asserted conflicts with the express terms of federal law and whether its consequences sufficiently injure the objectives of the federal program to require nonrecognition.
 
 
 38
 Hisquierdo v. Hisquierdo, 439 U.S. 572, 581-83, 99 S.Ct. 802, 808-09, 59 L.Ed.2d 1 (1979) (citations omitted). Thus, the appellee may not prevail in this case simply by showing a mere conflict between the bequest and the language of ERISA, or by showing that Congress did not contemplate the type of bequest at issue here. Rather, in order to prevail, the appellee must demonstrate that California law allowing the non-employee spouse to bequeath her community property share of pension benefits would do "major damage" to "clear and substantial" federal interests. See Operating Engineers' Local No. 428 Pension Trust Fund v. Zamborsky, 650 F.2d 196, 199 (9th Cir.1981) ("In Hisquierdo ..., the Court clearly sets out the standard by which this case must be judged.... By enacting ERISA, Congress has not 'positively required by direct enactment' that garnishments of the sort at issue here be preempted."). This he has utterly failed to do.
 
 B.
 
 39
 ERISA's spendthrift provision states simply that "[e]ach pension plan shall provide that benefits provided under the plan may not be assigned or alienated." 29 U.S.C. Sec. 1056(d)(1). Because the property transfer does not fall explicitly into the QDRO exception created by the REA, the majority, with only a cursory analysis of ERISA and the proper application of the spendthrift provision, holds that ERISA's spendthrift provision precludes application of California law. The case law and legislative history preceding the REA belie this conclusion.
 
 
 40
 It became clear shortly after ERISA's passage in 1974 that Congress had left open a major question concerning the interpretation of the statute: whether the spendthrift provision enacted in that year preempted state court orders directing transfer of pension benefits incident to divorce and separation to the non-employee spouse and dependents. While the generally worded language of the spendthrift provision on its face would seem to preclude such transfers, "[o]n the other hand, it is a commonplace that a literal interpretation of the words of a statute is not always a safe guide to its meaning." Cartledge v. Miller, 457 F.Supp. 1146, 1154 (S.D.N.Y.1978) (quoting Peter Pan Fabrics v. Martin Weiner Corp., 274 F.2d 487, 489 (2d Cir.1960) (L. Hand)).
 
 
 41
 The issue of whether the spendthrift restriction applied to spouses was raised in case after case. See, e.g., Savings & Profit Sharing Funds of Sears Employees v. Gago, 717 F.2d 1038 (7th Cir.1983); Bowen v. Bowen, 715 F.2d 559 (11th Cir.1983) (per curiam); Operating Engineers' Local No. 428 v. Zamborsky, 650 F.2d 196 (9th Cir.1981); A.T. & T. v. Merry, 592 F.2d 118 (2d Cir.1979); Cody v. Riecker, 594 F.2d 314 (2d Cir.1979); Ball v. Revised Retirement Plan, 522 F.Supp. 718 (D.Col.1981); Central States, Southeast & Southwest Areas Pension Fund v. Parr, 480 F.Supp. 924 (E.D.Mich.1979); Senco of Florida, Inc. v. Clark, 473 F.Supp. 902 (M.D.Fla.1979); Cartledge v. Miller, 457 F.Supp. 1146 (S.D.N.Y.1978); Western Electr. Co. v. Traphagen, 166 N.J.Super. 418, 400 A.2d 66 (1979); Biles v. Biles, 163 N.J.Super. 49, 394 A.2d 153 (1978); Wanamaker v. Wanamaker, 93 Misc.2d 784, 401 N.Y.S.2d 702 (Fam.Ct.1978). Two features of these cases are relevant to determination of the issue at hand. First, the debate was confined to issues of property division and support rights in the divorce or separation context. Application of marital property laws in the context of testamentary bequests was not an issue in this hotly and frequently waged debate in the courts, perhaps because most states either failed to recognize a spousal interest in the other spouse's pension or, as with California during this period, considered such interests to be terminated at death.[1]
 
 
 42
 Second, virtually every court to consider this issue, including this circuit, and every case cited above, recognized that Congress had not intended for the spendthrift provision, despite its general wording, to apply to family property rights in the divorce/separation context. But see General Motors Corp. v. Townsend, 468 F.Supp. 466 (E.D.Mich.1976). Some of these decisions were based on the courts' perception that Congress did not intend to preclude spousal and child support that the employee's spouse and children depended upon for their well-being, a factor not relevant here. However, many decisions rested on a rationale applicable to testamentary bequests as well: that the spendthrift provision was not intended to apply to any transfers or allocations between the employee and his or her spouse and dependents. As stated by the Second Circuit:
 
 
 43
 The purpose of the proscription on alienation and assignment is to protect an employee from his own financial improvidence in dealings with third parties. The provision is not intended to alter traditional support obligations but rather to assure that the employee and his beneficiaries reap the ultimate benefits due upon retirement.
 
 
 44
 AT & T v. Merry, 592 F.2d at 124.
 
 
 45
 The Supreme Court of California phrased the proposition in a different way in Marriage of Campa, 89 Cal.App.3d 113, 152 Cal.Rptr. 362, appeal dismissed, 444 U.S. 1028, 100 S.Ct. 696, 62 L.Ed.2d 664 (1980). According to the court,
 
 
 46
 The Fund points to ERISA's restrictions on assignment or alienation of pension benefits ... as evidence of Congress' concern that the pension benefits be preserved intact until an employee reaches retirement age. But dividing the benefits, once they are received, between an employee and his former spouse in no way clashes with this objective. It merely assures that the ex-wife partakes of the pension to the extent that it was earned as a result of the community effort.... Her rights are those of an owner, not a creditor.
 
 
 47
 89 Cal.App.3d at 125, 152 Cal.Rptr. at 368 (citations omitted) (emphasis added). For this reason, the California Court of Appeal in Campa held that ERISA does not preempt a state court order in a marriage dissolution action that requires the trustees of a pension plan to divide pension payments between the employee and his or her ex-spouse. After the California Supreme Court denied the pension plan's petition for rehearing, 89 Cal.App.3d at 132, 152 Cal.Rptr. at 362, the United States Supreme Court entered a summary dismissal for want of a federal question. 444 U.S. 1028, 100 S.Ct. 696, 62 L.Ed.2d 664 (1980); see Stone v. Stone, 632 F.2d 740 (9th Cir.1980), cert. denied, 453 U.S. 922, 101 S.Ct. 3158, 69 L.Ed.2d 1004 (1981). As this circuit has recognized, the Supreme Court's summary dismissal operated as a decision on the merits for those questions presented in the jurisdictional statement. See Carpenters Pension Trust v. Kronschnabel, 632 F.2d 745, 748 (9th Cir.1980), cert. denied, 453 U.S. 922, 101 S.Ct. 3159, 69 L.Ed.2d 1004 (1981). In Campa, the jurisdictional statement set forth the following question: "Do the provisions of Title I of the Employee Retirement Income Security Act, commonly known as ERISA, supersede the provisions of the California community property law and implementing statutes and court rules insofar as they relate to an employee benefit plan covered by the Act?" This circuit has determined that, by dismissing the appeal, the Supreme Court necessarily found the answer to this question to be "no." Kronschnabel, 632 F.2d at 748.
 
 
 48
 Even those courts unwilling to find a blanket exception to the spendthrift provision for spouses recognized that the intent of Congress to apply this provision to spouses was not so clear as to warrant preemption where underlying policies were not in conflict. As stated by the Seventh Circuit:
 
 
 49
 [T]he Supreme Court has instructed us that when courts face a potential conflict between state domestic relations law and federal law, the strong presumption is that the state domestic relations law is not preempted:
 
 
 50
 On the rare occasion when state family law has come into conflict with a federal statute, this court has limited review under the Supremacy Clause to a determination whether Congress has "positively required by direct enactment" that state law be preempted. A mere conflict in words is not sufficient. State family and family-property law must do "major damage" to "clear and substantial" federal interests before the Supremacy Clause will demand that state law be overridden.
 
 
 51
 . . . . .
 
 
 52
 Hisquierdo v. Hisquierdo, 439 U.S. 572, 581, 583 [99 S.Ct. 802, 808, 809] (citations omitted).... [T]he case before us does not present such strong and clearly defined federal interests.
 
 
 53
 Saving & Profit Sharing Fund of Sears Employees v. Gago, 717 F.2d 1038, 1041-43 (7th Cir.1983).
 
 
 54
 Thus, prior to passage of the REA, all courts, including this one, were in virtual agreement that the spendthrift clause did not stand as a bar to recognition of a state marital property interest in a spouse's pension in all contexts. Further, there was strong support for the proposition that the spendthrift restriction did not apply to marital property law in any context.
 
 C.
 
 55
 The REA was passed against this legal backdrop. In it, Congress attempted to settle the battle being waged in the courts over spousal support rights in the ERISA context and to ensure that spouses were not deprived of these rights. It did so by explicitly codifying an exemption from ERISA's spendthrift restrictions for awards of pension rights to ex-spouses in divorce and separation proceedings. The legislative history of the bill, in explaining the need for the QDRO, refers to the battle waged in the courts: "[t]here is a divergence of opinion among courts as to whether ERISA preempts State community property laws insofar as they relate to the rights of a married couple to benefits under a pension, etc., plan." 1984 U.S.Code Cong. & Ad.News at 2565 (footnote omitted). It characterizes the effect of the QDRO as explanatory rather than restrictive: "the bill clarifies that such [a qualified domestic relations] order does not result in a prohibited assignment or alienation of benefits under the spendthrift provisions of the Code or ERISA." Id. at 2549 (emphasis added). While the majority argues that Congress, by phrasing the QDRO as an exemption from ERISA's spendthrift restrictions "expressly chose not to" except probate orders from the spendthrift restriction, there is no indication in the legislative history that the issue of probate orders was considered by Congress, at all. As Congress sought to resolve the debate waged in courts regarding the issue of divorce and separation, and as no debate had yet emerged on the issue of probate, it is unsurprising that the issue of probate orders never reached Congress.
 
 
 56
 While the majority seeks to apply the REA in a way that somehow operates to preempt community property law in the testamentary context, the legislative history of the REA supports exactly the opposite conclusion. The REA was passed in order to protect the rights of non-employee spouses, generally women, by recognizing that they, too, had an interest in the pension earned by the working spouse. Congress attempted to effectuate this objective by instituting the QDRO exception to the spendthrift provision in order to resolve the issue plaguing the courts by clarifying that state marital property law in the divorce/separation context was not preempted. At the same time, it set up annuity provisions to ensure that the non-employee spouse received a share of the pension benefits in the event the employee spouse predeceased her. The specific encodement of these provisions in order to "tak[e] ... into account changes in work patterns, the status of the marriage as an economic partnership, and the substantial contribution to that partnership of spouses who work both in and outside the home," was clearly not meant to strip the non-employee spouse of the benefit of other state laws also based on principles of equity between the employee and non-employee spouse. S.Rep. No. 98-575, 98th Cong.2d Sess. 1, reprinted in U.S.Code Cong. & Ad.News 2547 (1984).
 
 
 57
 Moreover, the REA's basic premise of equity for the non-working spouse supports the proposition that the REA is not intended as a bar to testamentary disposition of plan benefits by the non-employee spouse. The majority concedes that a predeceasing employee spouse may properly bequeath any remaining portion of ERISA benefits to a third party. Majority opinion, at 1457 n. 12; see also Art Builders Profit Sharing Plan v. Boseley, 649 F.Supp. 848, 851 (D.Md.1986); Profit Sharing Plan v. MBank Dallas, 683 F.Supp. 592, 595 (N.D.Tex.1988); Naddeo v. Officers & Employees Pension Plan, 637 F.Supp. 82, 84 (E.D.Pa.1986). Congress' stated goal of ensuring that both parties to a marriage are to be viewed as part of an economic partnership in which both partners have an interest in the pension benefits surely cannot be offended by the application of state community property law that would allow the non-employee spouse the same right to bequeath her interest in the retirement plans.
 
 D.
 
 58
 As Congress' passage of the REA cannot properly serve as the basis of a finding that ERISA preempts the bequest at issue simply because it does not fall into the QDRO exception to ERISA, the issue must be considered on its own merits. As generally recognized by courts prior to passage of the REA, simply because the general wording of the spendthrift provision would appear to encompass spouses is not sufficient to find preemption. Only if California property law does "major damage" to "clear and substantial" federal interests at issue in ERISA is it preempted.
 
 
 59
 I submit that the spendthrift provision does not require preemption in this case. First, the spendthrift provision should not apply as between spouses as "the purpose of the proscription on alienation and assignment is to protect an employee from his own financial improvidence in dealing with third parties." AT & T v. Merry, 592 F.2d 118 (2d Cir.1979); see also Guidry v. Sheet Metal Workers Nat'l Pension Fund, 493 U.S. 365, 110 S.Ct. 680, 687, 107 L.Ed.2d 782 (1990) (the anti-alienation provision was enacted "to safeguard a stream of income for pensioners (and their dependents, who may be, and perhaps usually are, blameless)") (emphasis added). A spouse is not a third-party creditor who Congress intended to bar.
 
 
 60
 Second, even were we to assume that the spendthrift provision applies to transfers or allocation between an employee and his or her spouse, the bequest in this case by a non-employee spouse of her community property to her own children poses no fundamental conflict with clear and substantial interests protected by ERISA. The majority attempts to argue that such a bequest would conflict with Congress' goal of ensuring pension protection for spouses who reach retirement age and their dependents. According to the majority, the bequest "illustrates the manner in which the general statutory purpose of ensuring a stream of income to pensioners and their dependents would be frustrated: Rather than preserving the funds for the use of the employee spouse and his dependents, the dissent would allow a deceased non-employee spouse to strip the living employee spouse and his dependents of pension benefits, in order to transfer those benefits to third parties." Opinion at 1460 n. 17. The majority's contention is completely undercut by its concession that ERISA allows the employee spouse to bequeath his share of the community property interest in any manner he chooses if he predeceases a non-employee spouse. Such a bequest to someone other than his dependents would also "strip the ... dependents of pension benefits in order to transfer those benefits to third parties." Clearly Congress, while seeking to protect the living, has determined that not all pension funds need to be preserved for the living in order to satisfy this goal when one spouse dies. The majority provides no explanation for how the non-employee spouse's bequest would frustrate ERISA's purpose when the concededly authorized bequest of an employee-spouse to a third party would not.[2] In addition, given Congress' explicit statement in enacting the REA that it seeks to "provide for greater equity under private pension plans," application of California's community property law in this instance would actually further a substantial federal interest.
 
 
 61
 The majority seeks to bolster its tenuous argument that the spendthrift provision applies to the transaction at issue on the ground that "the United States Supreme Court has consistently held that spendthrift provisions do apply, in general, to [interspousal] transactions." Majority Opinion, at 1458. According to the majority, "[t]he Court has noted a possible exception to the broad sweep of anti-alienation provisions in the case of alimony and child support, but has generally refused to extend this exception to other forms of community property." The cases cited by the majority in support of this proposition, however, all involve federal programs, which are based on considerably different statutory schemes, and which use federal money. In Hisquierdo v. Hisquierdo, 439 U.S. 572, 99 S.Ct. 802, the Supreme Court specifically distinguished such federal programs from ERISA:
 
 
 62
 In this case [involving a federal program], Congress has granted a separate spouse's benefit, and has terminated that benefit upon absolute divorce. Different considerations might well apply where Congress has remained silent on the subject of benefits for spouses, particularly where the pension program is a private one which federal law merely regulates. See Employment Retirement Income Security Act of 1974, 88 Stat. 829, 29 U.S.C. Sec. 101 et seq. Our holding intimates no view concerning the application of community property principles to benefits payable under programs that possess these distinctive characteristics.
 
 
 63
 Hisquierdo, 439 U.S. 572, 590 n. 24, 99 S.Ct. 802, 813 n. 24, 59 L.Ed.2d 1 (1979); see also Savings & Profits Sharing Fund of Sears Employees v. Gago, 717 F.2d 1038 (7th Cir.1983) ("We think both McCarty and Hisquierdo are quite distinguishable from the case before us. In both those cases very specific federal concerns about the goals and administration of federal programs were identified, requiring the preemption of state law. That no similarly identifiable federal concerns seem to be protected by section 206 makes it at least more likely that Congress, in enacting section 206 of ERISA, did not intend to rebut the presumption of non-preemption of state domestic relations law."). In fact, in contrast to the Court's treatment of these other cases, the Supreme Court, in dismissing In re Marriage of Campa, 89 Cal.App.3d 113, 152 Cal.Rptr. 362 (1979), appeal dismissed, 444 U.S. 1028, 100 S.Ct. 696, 62 L.Ed.2d 664 (1980), a pre-REA case, held that ERISA does not preempt state community property law. See Carpenters Pension Trust v. Kronschnabel, 632 F.2d 745, 747 (9th Cir.1980). Thus, where ERISA is concerned, the Court has already held that the existence of ERISA's anti-alienation provision does not serve as an absolute bar that preempts application of state community property law.[3]
 
 
 64
 The majority attempts to argue that the scheme it conceives Congress to have created is a sensible one. It tells us that, because pensions are designed "to ensure that both spouses would receive sufficient funds to afford them security during their lifetimes," it makes sense to ensure that the pension is not transferable when the non-employee spouse dies. The majority does not explain how, from the perspective of protecting the living, it makes sense to allow the employee spouse to bequeath his interest in a pension but not to allow the non-employee spouse to bequeath her interest.
 
 
 65
 Finally, the majority suggests that Congress intended a counterintuitive and unjust result: if the decedent had divorced her spouse before she died, she would have received as a matter of right her community interest in the pension earned as a result of her community effort and obviously could have bequeathed it. Having remained married, however, she forfeits her property rights in the pension plan and has nothing to bequeath to her family. Certainly Congress could not have intended these anomalous consequences.[4]
 
 III.
 
 66
 The majority opinion appears to be premised on the outmoded notion that those who forgo careers to work in the home while their partners work outside it are not full partners in the economic partnership thereby formed. Such spouses, the majority acknowledges, are entitled to an interest in the pension if they are left widowed or divorced and therefore may not be able to provide for themselves. Barring these dire circumstances, however, the opinion suggests, they are not entitled to any control over the disposition of the benefits as against the other spouse who has "really earned" them and should be able to dispose of them as he wishes.[5] In passing the REA, Congress rejected such outmoded notions of marital property rights; it clearly proclaimed that a spouse's interest in the pension is a matter of right, not charity. By turning Congress' intent on its head to find preemption in this case, the majority strips away the rights of those very persons Congress intended to protect.
 
 
 67
 I would reverse.
 
 
 
 *
 Honorable Pierce Lively, Senior United States Circuit Judge for the Sixth Circuit, sitting by designation
 
 
 [1]
 Roger Ablamis was joined as a nominal defendant in the action and his answer sought the same relief requested by the trustee. He is not a party to this appeal
 
 
 [2]
 The district court also concluded that the retirement plans preclude Ms. Ablamis from bequeathing an interest in the retirement accounts without Mr. Ablamis's consent. Mr. Ablamis did not consent to the bequest at issue here
 
 
 [3]
 For the definition of a qualified domestic relations order (QDRO), see infra at 1454
 
 
 [4]
 Obviously, although Congress was concerned primarily with widows, see Pension Equity For Women: Hearing on H.R. 2100 Before the Subcomm. on Labor-Management Relations of the Committee on Education and Labor, 98th Cong., 1st Sess. 26-28 (1983) (statement of Hon. Geraldine Ferraro), widowers benefit from the statutory protections as well
 
 
 [5]
 The survivor annuity requirement "also applies to any participant under a profit-sharing or stock bonus plan unless (1) the participant does not elect benefits in the form of a life annuity, (2) the plan pays the full vested account balance to the participant's surviving spouse if the participant dies, and (3) the plan is not a direct or indirect transferee of a plan required to provide automatic survivor benefits." S.Rep. No. 98-575 at 2, reprinted in 1984 U.S.Code Cong. & Ad.News at 2548. See 29 U.S.C. section 1055(b)(1)(C)
 
 
 [6]
 If a vested participant dies after the annuity starting date, the accrued benefits payable to him will be paid to his surviving spouse in the form of a "qualified joint and survivor annuity." A qualified joint and survivor annuity is an annuity:
 (1) for the life of the participant with a survivor annuity for the life of the spouse which is not less than 50 percent of (and is not greater than 100 percent of) the amount of the annuity which is payable during the joint lives of the participant and the spouse, and
 (2) which is the actuarial equivalent of a single annuity for the life of the participant.
 29 U.S.C. section 1055(d).
 If a vested participant dies before the annuity starting date, the surviving spouse will receive benefits for her lifetime in the form of a qualified preretirement survivor annuity. Subject to certain conditions, the qualified preretirement survivor annuity must be not less than the payments that would have been made under the qualified joint and survivor annuity. 29 U.S.C. section 1055(e).
 
 
 [7]
 Congress mandated such an exception in the case of "any voluntary and revocable assignment of not to exceed 10 percent of any benefit payment ..." provided that such assignment is not "made for the purpose of defraying plan administration costs." 29 U.S.C. 1056(d)(2). Congress, of course, also mandated the exception we discuss shortly--the QDRO exception which lies at the heart of this case
 
 
 [8]
 No California case cited by the executrix or our dissenting colleague holds that a predeceasing spouse may bequeath any interest in a surviving employee spouse's retirement plan to any person, although one Court of Appeal has held that, in light of California's community property law, a surviving employee spouse was required to pay an inheritance tax on a portion of the pension interests under his retirement plan upon the death of his non-employee spouse. See Estate of Austin, 206 Cal.App.3d 1249, 254 Cal.Rptr. 372 (1988). (Because California had repealed the tax as to interspousal transfers after the death of the non-employee spouse but seven years before the decision, Austin had little direct effect other than on the taxpayer.) In addition, there is dicta in another Court of Appeal case suggesting that a bequest to a third party would be upheld. See In re Marriage of Powers, 218 Cal.App.3d 626, 267 Cal.Rptr. 350 (1990). However, the California Supreme Court has not yet had occasion to comment on the question
 
 
 [9]
 Black's Law Dictionary defines "domestic relations" as "[t]hat branch or discipline of the law which deals with matters of the household or family, including divorce, separation, custody, support and adoption." BLACK'S LAW DICTIONARY 435 (5th ed. 1979)
 
 
 [10]
 Black's Law Dictionary defines "probate jurisdiction" as "[t]he exercise of the ordinary, generally understood power of a probate, surrogate or orphan's court, which includes the establishment of wills, settlement of decedents' estates, supervision of guardianship of infants, control of their property, and other powers and functions pertaining to such subjects." BLACK'S LAW DICTIONARY 1082 (5th ed. 1979)
 
 
 [11]
 Even if ERISA would permit a court to transfer, via a QDRO, pension benefits to the estate and subsequently to another alternate payee, Ms. Ablamis's beneficiaries would not qualify as an "alternate payee" as the term is defined in section 1056. An alternate payee must be a "spouse, former spouse, child or other dependent of the participant ". 29 U.S.C. section 1056(d)(3)(K) (emphasis added). While the beneficiaries of the trust are Ms. Ablamis's children, they are not Mr. Ablamis's. Nor are the beneficiaries dependents of Mr. Ablamis. Therefore, they do not fit within the definition of "alternate payees," and a court may not issue a QDRO that transfers pension benefits to them
 
 
 [12]
 It is true that under ERISA a predeceasing employee spouse can, under some circumstances, name a beneficiary for part of his pension benefits. But that is only because the statute presently affords him a greater pension benefit than the non-employee spouse. If the employee spouse dies first, he cannot designate a beneficiary for the part of the pension to which the surviving spouse is entitled as a survivor's annuity. The beneficiary can receive only the excess portion of the pension. When the non-employee spouse dies first, there is no excess: under ERISA the surviving employee spouse is entitled to 100% of his pension. Were the statute to be amended to provide equal benefits to the employee and non-employee spouse, Congress would have to consider two alternatives: permitting both spouses to bequeath a portion of the pension benefits, and prohibiting both spouses from doing so--at least without the consent of the other. Were Congress to adhere to its objective of seeking to ensure the financial well-being of retired employees and their spouses, it would in all likelihood choose the latter option. Moreover, were the dissent to take a position that was truly consistent both with its principles of equal treatment and with the statutory objective of providing financial security for the elderly, it would likewise advocate that view
 
 
 [13]
 While the Supreme Court rejected an analogous argument in Mackey relating to Sec. 514(a) of ERISA, it nonetheless stated that "the primary focus of [the qualified domestic relations order exception] was removing Sec. 206(d)(1)'s anti-garnishment protection from pension plan benefits when spouses sought enforcement of domestic support orders." Mackey, 108 S.Ct., at 2190
 
 
 [14]
 29 U.S.C. Sec. 1056(d)(3)(A) states that "[the prohibition against assignment and alienation of plan benefits] shall apply to the creation, assignment, or recognition of a right to any benefit payable with respect to a participant pursuant to a domestic relations order...."
 
 
 [15]
 In quoting the Court, we understand its characterization of community property concepts as akin to "amoral" business relationships to mean "neither moral nor immoral." According to Webster's Dictionary, the term "amoral" may be defined in three ways: (1) neither moral nor immoral; (2) outside or beyond the moral order or any specific traditional code of morals; and (3) refraining from making value judgments. Webster's Third New International Dictionary (G & C Merriam 1976). Here, the first or third definitions may be applicable; certainly, the second is not
 
 
 [16]
 Although the subject of domestic relations is generally a matter of state law, federal law preempts state law "where Congress has directly and specifically legislated in the area of domestic relations." Mansell, 109 S.Ct., at 2028 (holding that "the Former Spouses' Protection Act does not grant state courts the power to treat, as property divisible upon divorce, military retirement pay that has been waived to receive veterans disability benefits."). In Ridgway, the Supreme Court held that the controlling provisions of Servicemen's Group Life Insurance Act allowing an insured service member to designate a beneficiary prevail over and displace inconsistent state law. Ridgway, 454 U.S. 46, 102 S.Ct. 49, 70 L.Ed.2d 39. Ridgway noted that:
 Notwithstanding the limited application of federal law in the field of domestic relations generally ... this Court, even in that area, has not hesitated to protect, under the Supremacy Clause, rights and expectancies established by federal law against the operation of state law, or to prevent the frustation and erosion of the congressional policy embodied in the federal rights.... While "[s]tate family and family-property law must do 'major damage' to 'clear and substantial' federal interests before the Supremacy Clause will demand that state law be overridden," ... "[t]he relative importance to the State of its own law is not material when there is a conflict with a valid federal law, for the Framers of our Constitution provided that the federal law must prevail." ... And, specifically, a state divorce decree, like other law governing the economic aspects of domestic relations, must give way to clearly conflicting federal enactments.... That principle is but the necessary consequence of the Supremacy Clause of our National Constitution.
 Ridgway, 454 U.S., at 54-55, 102 S.Ct., at 54-55 (citations omitted).
 
 
 [17]
 The dissent contends that "the bequest in this case by a non-employee spouse of her community property to her own children poses no fundamental conflict with clear and substantial interests protected by ERISA." While our analysis is not dependent on the fact that the employee's pension benefits were left to a third party--i.e. someone not in the employee spouse's immediate family--the bequest here illustrates the manner in which the general statutory purpose of ensuring a stream of income to pensioners and their dependents would be frustrated. Rather than preserving the funds for the use of the employee spouse and his dependents, the dissent would allow a deceased non-employee spouse to strip the living employee spouse and his dependents of pension benefits, in order to transfer those benefits to third parties. The dissent offers no justification consistent with the statutory purposes for allowing such a bequest
 
 
 [1]
 I have located only one district court case in which the issue of ERISA preemption was raised in the testamentary context prior to passage of the REA, Employees Sav. Plan of Mobil Oil Corp. v. Geer, 535 F.Supp. 1052 (S.D.N.Y.1982). In that case, the district court considered whether the non-employee spouse's right under state law to a community property interest in the predeceasing employee spouse's pension was preempted. The court in that case based its finding that ERISA did not preempt state community property law in this context on the ground that "[i]f the expectation of retirement benefits may be reached despite ERISA's express prohibition of assignment or alienation, then surely the final distribution of a decedent's vested interest in a plan cannot escape the application of community property principles." Id. at 1057. Congress addressed the issue of providing for a non-employee spouse who is predeceased by an employee spouse in the annuity provisions of the REA. It is the situation in which the non-employee spouse predeceases the employee spouse which is at issue here
 
 
 [2]
 The majority suggests that if Congress were to be true to its objective of seeking to ensure the financial well-being of retired employees and their spouses during their lifetimes, it would prohibit both spouses from bequeathing pension benefits without the consent of the other. It further suggests that "[w]ere the dissent to take a position that was truly consistent both with its principle of equal treatment and with the statutory objective of providing financial security for the elderly, it would likewise advocate that view." Op. at 1457 n. 12. The majority seems to miss the question to be answered. It is not whether Congress has crafted the most perfect statute possible to meet the goal of affording employees and their spouses lifetime security, or whether the dissent could craft a better one, but whether state marital property law fundamentally conflicts with the statute that Congress has, in fact, created
 The majority's explanation for why a testamentary disposition of a predeceasing employee does not violate ERISA while a testamentary disposition of his predeceasing spouse does is equally fundamentally flawed. According to the majority:
 It is true that under ERISA a predeceasing employee spouse can, under some circumstances, name a beneficiary for part of his pension benefits. But that is only because the statute presently affords him a greater pension benefit than the non-employee spouse. If the employee spouse dies first, he cannot designate a beneficiary for the pension to which the surviving spouse is entitled as a survivor's annuity. He can only bequeath the excess portion of the pension. The beneficiary can receive only the excess portion of the pension. When the non-employee spouse dies first, there is no excess: under ERISA the surviving employee spouse is entitled to 100% of his pension.
 Id. The explanation begs the question. The surviving employee spouse is entitled to 100% of his pension only if state marital property law not preempted by ERISA allows him control of the whole. As the above analysis makes clear, California marital property law does not entitle the surviving employee spouse control over 100% of his pension.
 Insofar as the majority may be arguing that the REA annuity provisions themselves conflict with state community property law, this argument, too, fails. The annuity provisions created by the REA were intended to provide the nonparticipant spouse protection during her life. They address only two circumstances: the pre- and post-retirement death of a participant spouse. They say nothing about the pre- or post-retirement death of a predeceasing non-employee spouse and certainly cannot be read as creating the testamentary disenfranchisement of a predeceasing spouse. As argued by the executor, these provisions are "barren of any language of 'positive requirement' by 'direct enactment' which supersedes and preempts Decedent's state law rights." Appellant's Opening Brief (filed July 28, 1989), at 31-32.
 
 
 [3]
 The majority also cites Guidry v. Sheet Metal Workers National Pension Fund, 493 U.S. 365, 110 S.Ct. 680, 107 L.Ed.2d 782 (1990), for the proposition that in the absence of an explicit exception to ERISA's spendthrift clause, alienation of an employee's benefits is prohibited. Guidry concerned whether a constructive trust could be placed on pension benefits in favor of a union where the employee had embezzled funds from the union. The Supreme Court stated that an explicit exception was required to impose such a constructive trust in favor of a third party on the ground that the spendthrift provision "reflects a considered congressional policy choice, a decision to safeguard a stream of income for pensioners (and their dependents, who may be, and perhaps usually are, blameless ), even if that decision prevents others from securing relief for the wrongs done them." 110 S.Ct. at 687 (emphasis added). The Supreme Court conceived of the spendthrift clause as barring transfers to third parties rather than to spouses
 
 
 [4]
 Neither, I submit, did Congress intend to introduce the blatant disparities in treatment between the dependents of the employee spouse and the dependents of the non-employee spouse that the majority contends ERISA mandates. The majority bases its contention on general language in the legislative history concerning ERISA's purpose stating that Congress sought to protect "employees and their dependents," without mentioning the dependents of the employee's spouse. On this basis, the majority asserts, the decedent's bequest of her interest in the pension to her children violates ERISA's statutory purpose whereas presumably a bequest by the employee to his children would further ERISA's statutory purpose. Given Congress' recognition in the REA that marriage is an economic partnership and of the substantial contribution to that economic partnership of both spouses, I would not impute to Congress the intent to distinguish between the dependents of the employee and the dependents of the spouse with reference to benefits. As both the employee and spouse contributed to the economic partnership, in my view, Congress would consider the protection of both groups of dependents to be a goal of ERISA
 
 
 [5]
 The opinion concludes that the non-employee spouse does not have the same right to testamentary transfer of the pension assets as the employee spouse by framing the issue on the assumption that the worker, not the spouse, is the real owner of the pension: it holds that "an employee whose pension interests are covered by ERISA may not be so divested of his entitlement." Op. at 1452 (emphasis added). Properly framed, the issue is whether the decedent, as one-half of an economic partnership, has a right to transfer her entitlement in the plan benefits pursuant to state marital property law
 Moreover, in justifying the scheme the majority contends Congress intended, it suggests the employee is entitled to his pension, while the employee's spouse is entitled only to some lesser degree of protection:
 Congress wanted to ensure that workers would have the security of a fair pension for their lifetimes. Congress also wanted surviving spouses to have what it considered a reasonable degree of security. In this connection, Congress wisely deemed it necessary to protect the divorced spouse for the remainder of her lifetime.
 Majority opinion at 1457.