July 16, 1996


No. 94-30178, <u>Boggs v. Boggs</u>

     WIENER, Circuit Judge, with whom POLITZ, Chief Judge, KING, BENAVIDES, STEWART and PARKER, Circuit Judges, join, dissenting from failure to grant rehearing en banc.

     My concerns about the panel majority opinion in this case prompted me to request a poll of the active judges of this court to rehear the case en banc. In the ensuing poll, less than a majority of the judges voted to rehear the case. With the utmost respect, I dissent from the refusal of a majority of the active judges of this court to rehear this case en banc.

I

WHY EN BANC?

     The instant appeal forces us to come to grips with the conundrum that results when the irresistible force of ERISA,[1] particularly its preemption and anti-alienation provisions, meets the immovable object of a state's community property regime, particularly its immediate vesting and assignability provisions. The panel opinion held that the force of ERISA could not budge Louisiana's community property regime; and in so holding created a circuit split with the "other" majority community property circuit.[2] Despite the split thus created, the monumental and

_____

     [1] Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001 <u>et seq</u>.

     [2] <u>See</u> <u>Ablamis v. Roper</u>, 937 F.2d 1450 (9th Cir. 1991). The Ninth Circuit includes the community property states of Arizona, California, Idaho, Nevada, and Washington. In substantially similar circumstances, the Department of Labor also has concluded that ERISA mandates preemption. DOL Advisory Opinion # 90-46A (December 4, 1990).

pervasive effect on the great majority of the residents of this circuit, and the 2-to-1 division of the panel that heard this appeal, this court refused to rehear the panel opinion en banc. I write separately not only to voice my disappointment with that failure of the entire court to consider such an important appeal, but also to address the merits of this issue of great consequence.

Recognizing that employee benefit plans affect "the continued well-being and security of millions of employees and their dependents,"[3] Congress enacted the unique and highly pervasive Employee Income Retirement Security Act (ERISA) in 1974, thus making the regulation and administration of non-governmental retirement and benefit plans an exclusively federal concern. Today, over twenty years later, the preeminence and importance of pension plans and welfare benefit plans in the lives of most Americans has grown exponentially. With their combined assets totaling over 4.7 trillion dollars, employee benefit plans cover an estimated 54 million employees.[4] In addition to its economic significance, this landmark legislation plays a dominant role in present-day federal jurisprudence as reflected, for example, by the unusually high number of ERISA cases for which the Supreme Court has granted writs in recent years.[5] In sum, ERISA and employee

___

[3]  29 U.S.C. § 1001(a).

[4]  U.S. DEP'T OF COMMERCE, BUREAU OF THE CENSUS, STATISTICAL ABSTRACT OF THE UNITED STATES at 383, 535 (115th ed. 1995).

[5]  E.g., Lockheed Corp. v. Spink, 116 S. Ct. 1783 (1996); Varity Corp. v. Howe, 116 S. Ct. 1065 (1996); Peacock v. Thomas, 116 S. Ct. 862 (1996); New York Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co., 115 S. Ct. 1671 (1995);

benefit plans are ubiquitous and integral parts of our society.

Within the foregoing framework, the following two factors were urged by the panel majority as reasons why this case should not be voted en banc: (1) the parties themselves had not filed a motion for panel rehearing or suggestion for rehearing en banc, and (2) the arguments that I presented in favor of ERISA preemption are not the arguments that were presented to the district court or to the panel. In this instance, I find those reasons wholly unpersuasive.[6] Moreover, they obscure the fact that this case presents an issue of critical and continuing importance to both temporary and permanent residents — past, present, and future — of all community property states, a category comprising the two most populous states of this circuit.[7] Not only is this issue one of legal primacy, it literally touches the pocketbooks of hundreds of thousands if not millions of plan participants and their spouses during their retirement years. In addition to creating a circuit

---

Curtiss-Wright Corp. v. Schoonejongen, 115 S. Ct. 1223 (1995).

[6] First, we cannot tell why the appellant has not asked for panel or en banc rehearing: It may be economics, it may be personal, it may be tactical, etc. Regardless of the reason, such inaction by the parties should not here control our determination to rehear a case of this importance. Second, my argument favoring rehearing this case en banc and the analysis that follows, focuses on the legal interpretation of ERISA's preemption and spendthrift provisions. These are issues and they have been briefed by both parties; they are not "new" issues. Moreover, to the extent that any of my arguments discuss new theories which should not be entertained — a proposition with which I disagree — these arguments are merely "belt and suspenders" support for the parties' arguments on the same issues that are and have been squarely before this court.

[7] Both Texas and Louisiana are community property states.

split, the panel opinion has all the "bombshell" potential of making an earth-shaking impact on an area of the law as pervasive as ERISA in general and pensions in particular. A case of this magnitude should bear the imprimatur of the entire court, even if the en banc court were ultimately to reach the same result as has the panel.

## II

## THE MERITS

I do not suggest that the substantive issues of this case are easy ones. Indeed, in addition to an understanding of the complexities of ERISA, an understanding of the nature of retirement plans, particularly defined benefit plans, is crucial. To begin with, it is axiomatic that there can be no rights greater than those created by the retirement plan, the contents of which, for ERISA plans, is largely dictated by that statute. That the panel majority "granted" to the heirs of the predeceased first spouse an interest in the survivor annuity of the second spouse — despite the undeniable fact that this survivor annuity never even came into existence during the lifetime of the first spouse, but only upon her widower's re-marriage — may suggest that proper consideration has not been given to the nature of pensions in general or to the Bell Plan itself.

It is equally axiomatic that this appeal requires a keen understanding of the law of ERISA. As this court could not duck the core issue of preemption which lies at the busy intersection

4

where ERISA and community property law collide, I would have had us conclude that the length and breadth of the preemption mantle in which Congress has cloaked ERISA gives it the right-of-way. More specifically, I would have had our court hold that ERISA preempts Louisiana community property law to the extent that such law would purport to recognize and enforce an interest of the heirs or legatees of a deceased nonparticipant spouse as to her "community interest" in an ERISA-qualified pension plan. As explained more fully below, I believe that this conclusion is compelled by the mandate of the federal statute, the intent of Congress, and the purposes and structure of ERISA, not the least of which is the requirement of national uniformity of such pension plans in the private sector of our national economy. Furthermore, that the state law claims in this case have been brought against the beneficiaries of the plan, as opposed to the plan itself or the plan's fiduciary, in no way circumvents or defeats ERISA's potent preemptive force.

A

FACTS AND PROCEEDINGS

Isaac Boggs (Participant) was employed by South Central Bell from June 18, 1949, until his retirement on September 1, 1985, and participated in an ERISA-qualified pension plan (the Bell Plan). Participant was already married to Dorothy Boggs (First Spouse) when he went to work for South Central Bell. Their marriage lasted until her death, which occurred some six years prior to his retirement. At all relevant times their Louisiana marital property

5

regime was one of community property. Three sons of that marriageSQDavid Bruce Boggs, Thomas Frank Boggs, and Harry Maurice Boggs (the Sons), Defendants-Appellees hereinSQsurvived both of their parents.

When First Spouse died, her estate included an undivided one-half interest in all property belonging to the community of acquets and gains theretofore existing between her and Participant (the community). By testament, First Spouse left one-third (1/3) of her estate to Participant outright and confirmed to him for his lifetime the usufruct[8] of the surviving spouse in the remaining two-thirds (2/3) of her estate. She left to the Sons the naked ownership[9] of the two-thirds share of her estate that she burdened with Participant's usufruct.

Among the assets inventoried in the judicial administration of First Spouse's succession was a one-half (½) community interest in Participant's account in the Bell Plan. As the balance of his account was valued at $42,388.57, her community half interest was listed in her succession at $21,194.29.

Within a year after the death of his First Spouse, Participant remarried. His second and final marriage was to Plaintiff-Appellant Sandra Jean Dale Boggs (Surviving Spouse), to whom he was married and with whom he was residing at the time of his death in 1989.

_____

[8]  Roughly the equivalent of a common law life estate.

[9]  Roughly the equivalent of a common law remainder interest.

6

The Bell Plan provided several types of retirement benefits to Participant. The first benefit that he received on retirement was a lump sum payment of $151,628.94, which he "rolled over" into an Individual Retirement Account (IRA). It was worth $180,778.05 at his death. Participant's second retirement benefit was a pension annuity, which provided monthly payments of $1,777.67 until his death, then converted automatically to a survivor's annuity in favor of Surviving Spouse. That annuity continues to provide monthly payments to her and is scheduled to do so for her lifetime. The third benefit that Participant received on retirement consisted of 96 shares of AT&T stock and a life insurance policy in which Surviving Spouse was designated as the beneficiary. The fact that all relevant employee benefit plans of South Central Bell are ERISA plans is undisputed.

Some time after Participant's death in 1989, the Sons filed an action in state court seeking an accounting on the usufruct that their mother had confirmed to Participant in her testament, as well as a judgment awarding them a portion of his retirement benefits. Of particular significance to this appeal is the fact that the Sons have claimed an ownership interest in past and future annuity payments to Surviving Spouse.

In response to the Sons' state court action, Surviving Spouse filed this suit in district court seeking a declaratory judgment that ERISA preempts the Sons' Louisiana community property claims to the extent that they purport to affect either past or future retirement benefits received or to be received by Participant or by

7

Surviving Spouse under the Bell Plan. Specifically, Surviving Spouse asserted that ERISA alone governs the entitlement to and payment of benefits under the Bell Plan, and that under ERISA rules she is the designated beneficiary. The Sons countered, insisting that this case is not controlled by ERISA, as a consequence of which the district court lacked jurisdiction. The Sons argued alternatively that ERISA does not preempt any of the aspects of Louisiana community property law that are at issue in this case.

As a preliminary matter, the district court determined that it did have jurisdiction by virtue of 29 U.S.C. § 1132. Proceeding to the merits, the district court rejected the contentions of Surviving Spouse that ERISA preempts the applicable provisions of Louisiana community property law, and denied her the declaratory judgment she sought. On appeal Surviving Spouse asked this court to review and then reverse that decision. Two of the three judges on the panel that heard the appeal of that ruling affirmed it, and I provoked an en banc poll in which a majority of my colleagues voted against rehearing. It is from that vote that I respectfully dissent.

B

ANALYSIS

I have no quarrel with the district court's ruling on jurisdiction or with the panel's affirmance thereof. I therefore proceed directly to the substantive issues of the case. Surviving Spouse sought a declaratory judgment that ERISA's preemption and its anti-alienation rules trump any state cause of action that

8

would recognize an interest of the heirs or legatees of the predeceased nonparticipant spouse in any retirement benefits under an ERISA plan when the basis of the claims of the heirs or legatees is the purported "alienation" —— here, a testamentary transfer —— of such nonparticipant spouse's putative community property interest in those plan benefits. The district court found no ERISA preemption and rejected the arguments of the Surviving Spouse. On appeal, she asked this court to revisit the preemption issue and reverse the district court. I shall review the district court's preemption analysis de novo,[10] examining briefly the pertinent aspects of Louisiana's community property regime and then, in greater detail, the pertinent aspects of ERISA.[11]

1.   Community Property Rights

Louisiana's community property system recognizes the contribution made by each spouse, employed or unemployed, to the marriage and to the acquisition of marital property. Under

---

[10]   Hook v. Morrison Milling Co., 38 F.3d 776, 780 (5th Cir. 1994).

[11]   My analysis focuses solely on the preemption of state law as it applies to ERISA-covered pension plans. As noted above, Participant "rolled over" a portion of his benefits into an IRA. An IRA, of course, is not an ERISA-covered pension plan. It is worth pointing out, however, that at First Spouse's date of death, none of the benefits had been "rolled over"; all were still held by the trusts that were ERISA-covered pension plans. For me, this fact is reason enough to conclude that the benefits which were eventually "rolled over" are not excepted from my preemption analysis. Neither the district court nor the panel majority, however, addressed this issue. Also not addressed were the nature and the terms of the plan from which these "rolled over" benefits were received. My conclusion in favor of preemption, however, in no way depends on the type of ERISA-covered pension plan involved (e.g., defined benefit plan, profit sharing plan, etc.) or on its particular terms.

Louisiana community property law, each spouse owns "a present undivided one-half interest" in each community asset, which interest vests from the moment the asset is acquired.[12] Louisiana law provides that, at the termination of the community property regime, each spouse owes to the other spouse (or, when the community is terminated by the death of the spouse, to his or her heirs or legatees) an accounting for community property under his or her control.[13] Generally, retirement benefits acquired during the existence of the community are considered by Louisiana law to be community assets.[14]

2.    ERISA - The Statute

Perhaps the most novel and pervasive private civil legislation enacted by Congress in the last quarter century, ERISA is a comprehensive statute which uniquely is co-administered by two departments of the federal government[15] and is designed to protect the interests of participating employees and their dependents in nongovernmental employee benefit plans.[16] Congress adopted ERISA for the twin purposes of establishing national uniformity in employee benefit law and safeguarding retirement benefits.[17] A fundamental tenet of ERISA is that retirement benefits are

---

[12]  Hare v. Hodgins, 586 So.2d 118, 122 (La. 1991).

[13]  See La. Civ. Code Ann. art. 2369.

[14]  Hare v. Hodgins, 586 So.2d 118, 122 (La. 1991).

[15]  Department of the Treasury and Department of Labor.

[16]  Ingersoll-Rand Co. v. McClendon, 498 U.S. 133, 137 (1990).

[17]  Shaw v. Delta Air Lines, 463 U.S. 85, 90-91 (1983).

protected to assure delivery of retirement income to participants and their dependents.[18] The overarching device that Congress wrote into ERISA as an all-encompassing umbrella to protect the operable provisions of the Act, and as the principal mechanism to ensure enforcement of those provisions, is preemption: supersedure of any state law related to an employee benefit plan.[19]

## 3. Preemption

Whether a particular state action is preempted by some federal law is always a question of Congressional intent.[20] "The purpose of Congress is the ultimate touchstone."[21] In divining Congressional intent, the starting point is an examination of the explicit statutory language and the structure and purpose of the statute.[22] Before embarking on that examination, though, I note at the outset, as did the panel majority, that domestic relations law has long been recognized as the domain of the states. The Supreme Court has acknowledged that "[s]tate family and family-property law must do 'major damage' to 'clear and substantial' federal interests

---

[18] See 29 U.S.C. § 1001b(a)(2)("The Congress finds that the continued well-being and retirement income security of millions of workers, retirees, and their dependents are directly affected by such plans."); Guidry v. Sheet Metal Workers Nat'l Pension Fund, 493 U.S. 365, 376 (1990) (noting that the decision to safeguard a stream of income for pensioners and their dependents is a considered congressional policy choice).

[19] 29 U.S.C. § 1144(a).

[20] Ingersoll-Rand, 498 U.S. at 137-38.

[21] Id. at 138 (quoting Allis-Chalmers Corp. v. Lueck, 471 U.S. 202, 208 (1985)).

[22] FMC Corp. v. Holliday, 498 U.S. 52, 58 (1990).

11

before the Supremacy Clause will demand that the state law be overridden."[23] This has never meant, however, that domestic relation laws are wholly immune from federal preemption; moreover, "[t]he relative importance to the State of its own law is not material when there is a conflict with a valid federal law, for the Framers of our Constitution provided that the federal law must prevail."[24] Nevertheless, for purposes of this preemption analysis, I assume without granting that the most deferential standard is applicable and proceed accordingly.[25]

Section 514(a) of ERISA[26] declares universally that ERISA shall "supersede any and all State laws insofar as they may now or hereafter <u>relate to</u> any employee benefit plan described in

---

[23] <u>McCarty v. McCarty</u>, 453 U.S. 210, 220 (1981) (quoting <u>Hisquierdo v. Hisquierdo</u>, 439 U.S. 572, 581 (1979)).

[24] <u>Ridgway v. Ridgway</u>, 454 U.S. 46, 54-55 (1981).

[25] This deference accorded the states in the area of domestic relation law is usually applicable in the context of resolving a direct conflict between federal and state law rather than in a case implicating statutory preemption, such as ERISA's express preemption provision. Within this framework I nevertheless discern a distinction between community property law on the one handSQwhich is at least as much "property" law as it is "domestic relations" lawSQand, on the other hand, those state laws that govern purely interspousal aspects of domestic relations, such as marriage, separation, divorce, dower, curtesy, alimony, support of dependents, and the like. Thus I recognize the argument that, unlike the more purely status-related domestic relations laws, community property laws are fair game for ERISA and its preemption. The discussion <u>infra</u> of REA and its crown jewel, the QDRO, demonstrates beyond cavil that Congress too saw community property as fair game.

[26] 29 U.S.C. § 1144(a).

12

section 4(a) and not exempt under section 4(b)."[27]  Courts have interpreted § 514(a) most broadly, observing that its deliberately expansive language was designed "to establish pension plan regulation as exclusively a federal concern."[28]

The Supreme Court has given the phrase "relate to" a "broad common-sense meaning."[29]  A state law relates to an ERISA plan "in the normal sense of the phrase if it has connection with or reference to such a plan."[30]  A state law can relate to an ERISA plan even if that law was not specifically designed to affect such plans, and even if its effect is only indirect.[31]  The Supreme Court has held a state law claim to be preempted when it was "premised on" the mere existence of an ERISA plan.[32]

Nevertheless, ERISA preemption is not wholly devoid of outer limits.  The Supreme Court has cautioned that "[s]ome state actions may affect employee benefit plans in too tenuous, remote, or peripheral a manner to warrant a finding that the law `relates to'

---

[27]  Id.  (emphasis added).  Section 4(b) exemption is not implicated in this case.

[28]  Ingersoll-Rand, 498 U.S. at 138 (internal quotations and citations omitted).

[29]  Pilot Life Ins. Co. v. Dedeaux, 481 U.S. 41, 47 (1987).

[30]  Shaw, 463 U.S. at 96-97.

[31]  Rozzell v. Security Services, Inc., 38 F.3d 819, 821 (5th Cir. 1994) (citing Pilot Life Ins. Co. v. Dedeaux, 481 U.S. 41 (1987)).

[32]  District of Columbia v. Greater Washington Bd. of Trade, 506 U.S. 125, 131 (1992) (citing Ingersoll-Rand, 498 U.S. at 140).

the plan."[33]

So, even though the borderlines that define those outer limits are not bright, the Court has shown us the approximate boundaries of the wide band within which a state law may fall and still be preempted by ERISA: As long as there is some relationship between the effect of a state law and an ERISA plan, the state law can be said to relate to such plan and therefore be preempted; only if that relationship is so tenuous, remote or peripheral as to eschew any meaningful nexus with the ERISA plan will preemption be avoided. Even if the asserted effect of state law is premised on nothing more than the mere existence vel non of an ERISA plan, or was not overtly intended to affect such plans and only does so indirectly, ERISA will nevertheless preempt.[34] It is in this perspective of extreme (but not totally unlimited) ubiquity that I proceed to examine the state laws here at issue to see if they are sufficiently related to the Bell Plan to be preempted.

_____

[33] Shaw, 403 U.S. at 100 n.21, 103 S.Ct. at 2901, n.21.

[34] As an aid in the preemption inquiry, this court has noted that preemption of a state law claim is more likely to be found if "(1) the claim addresses areas of exclusive federal concern, such as the right to receive benefits under the terms of an ERISA plan, and (2) the claim directly affects the relationship among the traditional ERISA entities (i.e., plan administrators/fiduciaries and plan participants/beneficiaries)." Hook v. Morrison Milling Co., 38 F.3d 776, 781 (5th Cir. 1994); see Sommers Drug Stores Co. v. Corrigan Enterprises, Inc., 793 F.2d 1456, 1467 (5th Cir. 1986). These factors appear to be the result of an attempt at distilling prior case law. See Sommers, 793 F.2d at 1467. Useful in some circumstances, it can be no substitute for an independent analysis of the issue presented. Although I believe a conclusion that ERISA preemption applies in this case could be reached using the factors above, the unique issue presented is best analyzed by examining the structure and purpose of the statute and Congressional intent on this point, the "ultimate touchstone" in determining preemption.

14

a.    Application of ERISA Preemption

The essence of the Sons' state action is a determination of the ownership of and entitlement to retirement benefits under an ERISA pension plan, the Bell Plan.  Thus, the Sons' claims are necessarily premised on the very existence vel non of the Bell Plan.[35]  The result sought by the Sons would effectively alter the Participant's beneficiary designation under the plan.[36]

The fact that the precipitating state court action happened to have been brought against the beneficiary only and not directly against the plan administrator does not immunize it from preemption.  ERISA's broad preemption mandate is not nearly so limited:  The indirect but palpable effect that the result sought by the Sons would have on the instant ERISA plan is none the less proscribed.[37]

As proof positive of a sufficient nexus between the Plan and

---

[35]    See Ingersoll-Rand, 498 U.S. at 140.

[36]    See Moore v. Philip Morris Cos., Inc., 8 F.3d 335, 340 (6th Cir. 1993) (state law that affects eligibility for plan benefits "relates to" the plan for preemption purposes); Brown v. Connecticut General Life Ins. Co., 934 F.2d 1193, 1195 (11th Cir. 1991) (state law determination of beneficiary of life insurance policy "relates to" an ERISA-covered employee benefit plan); Shiffler v. Equitable Life Assurance Soc'y, 838 F.2d 78, 81-82 (3d Cir. 1988) ("Thus while [the plaintiff] would have us consider her claims as setting forth state common law causes of action, clearly they 'relate to' the employee benefit plans when that phrase is given its broad common sense meaning, for no matter how her action is characterized her goal was to recover the proceeds claimed under the [plan].").

[37]    See Meeks v. Tullis, 791 F.Supp. 154, 157 (W.D. La. 1992) (holding that a claim by the heirs of a nonparticipant spouse against non-ERISA assets for the value of the community property interest is preempted by ERISA).

15

the state law at issue, one need only observe, for example, that any calculation of the benefits claimed by the Sons would unquestionably require an analysis of the terms and conditions of the Bell Plan, as well as its records and those of its participants.[38]  Moreover, plan administrators would be forced to take burdensome precautions to protect the rights and interests in plan benefits not only of the beneficiary but of the heirs and legatees as well.

In the context of national uniformity, the imposition of such additional duties, responsibilities, and liabilities on thousands of ERISA retirement plans and their fiduciaries would implicate different rules for each state in which one or more participants reside, thereby creating a polyglot nightmare of administration. Obviously, the pertinent provisions of those state property laws would have a material effect on employee retirement plans.  Surely, their effect cannot be said to be "too tenuous, remote, or peripheral" to exempt those laws from ERISA's statutory preemption.

And, though ERISA does expressly provide some statutory exceptions to its preemption provisions, the Sons do not argue that any are applicable here; and I have found none on my own.  As discussed more fully below, the Qualified Domestic Relations Order (QDRO) exception has not been satisfied; and the fact that Congress created other exceptions in other areas of the Act but provided

---

[38]  See Cefalu v. B.F. Goodrich Co., 871 F.2d 1290, 1294 (5th Cir. 1989) (holding that a state contract claim was "related to" an employee benefit plan and thus preempted when the court must refer to the pension plan to compute the damages sought, which were equal to the benefits he would have received under the plan).

16

none here is at least persuasive evidence that none was intended.

I therefore harbor no reservations in concluding that the Sons' putative state causes of action are related to the ERISA-covered Bell Plan and are therefore preempted by ERISA. I submit that the discussion which follows confirms that this conclusion is compatible with —— more accurately, mandated by —— Congressional intent and the purposes of ERISA, and demonstrates that, unless preempted, the states' laws in question would do "major damage" to the clear and substantial federal interests embodied in ERISA.

b.    Purposes and Structure of ERISA

Not only do the causes of action proffered by the Sons come within the liberal scope of the preemption statute under the "related to" test, but a conclusion sustaining preemption comports with the intent of Congress, the "ultimate touchstone"[39] in determining preemption. This intent is manifest in the structure and announced purposes of ERISA and is underscored by REA.[40]

(i)  Ensuring Retirement Income

Congress enacted ERISA to protect retirement benefits as a means of assuring receipt of retirement income by employees and their dependents. Conversely, nowhere in ERISA can the securing of inheritances by or legacies to the heirs or legatees of a participant employee or a nonparticipant spouse be identified as anything but antithetical to this purpose. In fact, allowing the

---

[39]  Ingersoll-Rand, 498 U.S. at 138.

[40]  Retirement Equity Act of 1984, Pub. L. No. 98-397, 98 Stat. 1426.

17

heirs of a nonparticipant spouse to claim plan benefits ——
particularly when doing so violates the congressionally decreed
hierarchy of recipients, at the pinnacle of which stands the
surviving spouseSQwould directly undercut the statute's express
purpose of ensuring that retirement income reaches participating
employees and their dependents.

(ii)  Uniformity

The other of ERISA's twin purposes —— national uniformity[41] ——
would be frustrated if heirs and legatees were allowed to prevail
under state laws that would produce results different from those
produced by ERISA's rules governing entitlement to and distribution
of benefits.  Even though the structures of the various states'
community property laws are generally similar, each community
property state has its own unique set of specific rules affecting
ownership and management of such property, including some notable
differences from state to state.[42]  Moreover, all community property
rules differ substantially from the concomitant rules of non-
community states.  As already noted, allowing these disparate laws
to trump ERISA could not help but have a materially adverse impact
on plan administration as well.  Unavoidably, the amount of
retirement income available for each participant in a given plan
would vary depending solely on the serendipity of a participant's

--------

[41]  See Ingersoll-Rand, 498 U.S. at 137.

[42]  For example, in some states the income from separate
property, such as retirement benefits acquired before marriage, is
separate property, and in other states income from separate
property becomes community property.

18

state of residence from time to time.  A domiciliary history of moving in and out of community property jurisdictions would create an impossible accounting and allocation problem.  Quite simply, ERISA's goal of uniformity would be unattainable if the ultimate enjoyment of ERISA plan benefits were left to the vicissitudes of the varying and disparate marital property laws of the several states, be they community or separate.

  c. <u>Retirement Equity Act of 1984 (REA)</u>[43]

  Perhaps nothing argues more convincingly for the conclusion I here advocate than the congressional intent manifested when ERISA was amended in 1984 by the enactment of REA.[44]  As originally adopted, ERISA failed to express with sufficient clarity the nature and extent of the interest of a nonparticipant spouse in the participant spouse's ERISA-covered retirement plan.  After ERISA had been on the books for a decade, Congress comprehensively amended and supplemented it with REA.  One of the express purposes of REA was to confirm the importance of the financial security of the <u>non</u>participant spouse and to safeguard his or her interest from

---

[43] Pub. L. No. 98-397, 98 Stat. 1426.

[44] I do not imply that REA is necessarily applicable to the instant case; only that it serves to remove doubt about the intent and purpose of Congress regarding the interplay of community property rules and ERISA, and the dominance of the latter when they conflict.  The district court, however, expressly indicated that REA supported its holding.  Moreover, even though the panel majority opinion did not expressly address REA, its holdings leave little doubt that its decision will be binding on cases in which no uncertainty exists that REA controls.  It is important to note, however, that even in the instant case, there can be no question that the rights of Surviving Spouse, not the Sons, are protected by REA.

19

the havoc that could be visited on it by the death of or divorce from the participant spouse.[45] The primary way that REA achieves these intended results is by (1) inventing the QDRO as the oneSQ<u>but only one</u>SQmechanism for allocating plan benefits between spouses,[46] and (2) mandating that ERISA pension plans include automatic survivor benefits in favor of the nonparticipant spouse.[47]

Significant to the instant case is the widely recognized fact that a central impetus to Congress's adoption of REA was the burgeoning body of conflicting jurisprudence addressing spousal rights in plans and plan benefits, particularly under community property regimes. During the ten years of ERISA's existence that preceded REA, disagreements developed among the various courts as to whether ERISA preempted state community property law claims to the extent that such laws related to the respective rights of the participant and nonparticipant spouses in and to benefits under ERISA plans.[48] R E A  d e l i b e r a t e l y SQ a n d ,  I  b e l i e v e , definitivelySQsettled the issue by creating the QDRO and making it the one and only mechanism by which, inter alia, a nonparticipant spouse's community interest in an ERISA plan can be recognized in

---

[45] <u>Ablamis v. Roper</u>, 937 F.2d 1450, 1453 (9th Cir. 1991).

[46] <u>See</u> 29 U.S.C. §§ 1056(d)(3), 1144(b)(7).

[47] 29 U.S.C. § 1055. The nonparticipant spouse can consent to waive this right if done in writing.

[48] <u>Compare Stone v. Stone</u>, 663 F.2d 740 (9th Cir. 1980) (holding that spousal community property rights on divorce were not preempted) <u>with Francis v. United Technology Corp.</u>, 458 F.Supp. 84 (N.D. Cal. 1978) (holding that ERISA preemption prevents the application of state community property law permitting attachment of plan benefits for family support purposes).

law.[49]  I think that in the instant case the district court fell into the same trap that a number of other courts have fallen into since 1984[50]SQciting and relying on now-obsolete _pre_-REA case law in a _post_-REA worldSQto support their erroneous conclusions that ERISA does not preempt causes of action of the nature instituted here by the Sons.[51]  It seems unavoidable to me, though, that the passage

---

[49]  A QDRO is any judgment, decree, or order made pursuant to a state domestic relations law (including community property) which (1) "creates or recognizes the existence of an alternate payee's right to, or assigns to an alternate payee the right to, receive all or a portion of the benefits payable with respect to a participant under a plan," and (2) "relates to the provision of child support, alimony payments, or marital property rights to a spouse, former spouse, child, or other dependent of a participant." 29 U.S.C. § 1056(d)(3)(B).

[50]  _See, e.g._, _Ablamis v. Roper_, 937 F.2d 1450 (9th Cir. 1991) (Fletcher, J., dissenting).

[51]  For example, the district court cites _Hisquierdo v. Hisquierdo_, 439 U.S. 572 (1979), a case in which the Supreme Court held that federal law preempted division of benefits under the Railroad Retirement Act pursuant to community property laws.  The _Boggs_ district court relied on the statement in _Hisquierdo_ that "[d]ifferent considerations might well apply where Congress has remained silent on the subject of benefits for spouses," and cited ERISA.  In addition to the fact that this statement is dicta, this rationale is unpersuasive because, after the enactment of REA, Congress can no longer be said to have remained silent on the subject of benefits for spouses.

The _Boggs_ district court also relied on _Carpenters Pension Trust Fund v. Campa_, 89 Cal.App.3d 113, 152 Cal.Rptr. 362 (1979), _appeal dismissed_, 444 U.S. 1028 (1980).  In _Campa_, the state court held that ERISA did not preclude the division of pension rights in state marital dissolution proceedings.  The district court stated that the Supreme Court's dismissal of _Campa_ for want of a federal question serves as a decision on the merits that ERISA's preemption provision does not override community property law.  Even assuming that _Campa_ provides a federal common law exception to the preemption and anti-alienation provisions of ERISA to allow the heirs of a nonparticipant spouse to acquire an interest in the pension planSQand I do not believe that it doesSQthe enactment of REA displaces any such exception.

of REA rendered nugatory the case law on point that was decided before passage of these amendments.

Although the QDRO was not developed to cope exclusively with community property issues under ERISA, both REA and its legislative history make absolutely clear that this imaginative invention was intended in large measure to deal with the recognition or partition of any community property interests <u>of the spouses</u> in plan benefits.[52]  Indeed, the official legislative history of REA specifically notes that "[t]here is a divergence of opinion among the courts as to whether ERISA preempts State community property laws insofar as they relate to the rights of a married couple to benefits under a pension, etc., plan."[53]

In the instant acronym, no letter is more important than "Q," for only when an [O]rder of a state [D]omestic [R]elations court is "[Q]ualified" does the post-REA version of ERISA permit an exception to the preemption rules in general and the anti-alienation ("spendthrift") rules in particular.  The legislative history of REA states that "the Committee believes that conforming changes to the ERISA <u>preemption</u> provision are necessary to ensure that <u>only those orders that are excepted from the spendthrift provisions are not preempted by ERISA</u>."[54]  Thus, if a state court

---

[52]  <u>See</u> 29 U.S.C. § 1056(d)(3)(B)(ii)(II) (defining a domestic relation order to include one made "pursuant to a State domestic relation law (<u>including a community property law</u>).") (emphasis added).

[53]  S.Rep. No. 98-575, 2d Sess. 19, <u>reprinted in</u> 1984 U.S.C.C.A.N. 2547, 2565.

[54]  <u>Id.</u> (emphasis added).

22

order that purports to divide spousal rights in an ERISA-covered plan does not meet the detailed, technical requirements of the federal statute, it is not "qualified" and therefore is afforded no exemption from ERISA's omnipotent preemption or anti-alienation rules. Quite clearly, I believe, with the advent of the QDRO, Congress purposefully provided an exclusive mechanism with which a nonparticipant spouse may obtain recognition of a community property right in the participant spouse's retirement plan.

What is also quite limited is the category of persons eligible to seek and obtain a QDRO: only spouses![55] Not their heirs, not their legatees, not their executors, not their trustees, not their creditors.[56] Akin to standing, the right of action to obtain a QDRO is strictly personal to the spouse qua spouse; and only a living spouse (or, in the event of divorce, a living ex-spouse) can obtain a QDRO.

Congress carefully crafted the QDRO to constitute a narrow exception to ERISA's otherwise all-encompassing preemption and spendthrift provisions. Any court order that purports to recognize the interest of a nonparticipant spouse —— or of any other party, for that matter —— in an ERISA plan or in the benefits of such a plan but fails to meet "qualification" muster under REA, in both form and substance, remains vulnerable to ERISA preemption. Here,

---

[55] Of course, a dependent child can be an "alternate payee" under the statute with respect to orders relating to the provision of child support. See 29 U.S.C. § 1056(d)(3)(B), (K). Providing for child support, however, is in no way implicated in this case.

[56] See Ablamis, 937 F.2d at 1456.

23

neither a probate order nor a judgment in the suit filed by the Sons to obtain an accounting could even come close to meeting the stringent definition of a QDRO.[57] The fact that Congress surgically carved out this single exception to preemption and restricted its availability to living spouses or ex-spouses, counsels ever so strongly against allowing the heirs or legatees or creditors or trustees of a spouse to obtain partition of a putative community property interest in an ERISA plan in any manner other than the one expressly sanctioned by the statute. To do otherwise would be to turn this preeminent post-REA feature of ERISA on its head.

Neither did REA pave a one-way street. By way of tradeoff and consistency, REA brings to ERISA both parity and protection for the nonparticipant spouse. It does so by mandating survivorship rights for the nonparticipant spouse in and to plan benefits.[58] Any _surviving_ nonparticipant spouseSQwhether first or subsequentSQis the automatic successor beneficiary under the plan,[59] unless he or she

---

[57] Ablamis v. Roper, 937 F.2d 1450 (9th Cir. 1991).

[58] 29 U.S.C. § 1055. This requirement applies to most, but not all, ERISA-covered plans. See 29 U.S.C. § 1055(b). I in no way suggest — and, indeed, would strongly disagree — that the conclusion in favor of preemption is applicable only to those ERISA-covered pension plans subject to this requirement.

[59] For example, if a vested participant dies after the annuity starting date, the accrued benefits payable to her will be paid to her surviving spouse in the form of a "qualified joint and survivor annuity" (QJSA). A QJSA is an annuity:
(1) for the life of the participant with a survivor annuity for the life of the spouse which is not less that 50 percent of (and is not greater than 100 percent of) the amount of the annuity which is payable during the joint lives of the participant spouses, and
(2) which is the actuarial equivalent of a single annuity for the life of the participant.

24

shall have executed an express and technically correct written consent in conformity with the statute.

Here again, I believe that the district court erred by relying on pre-REA case law. It did so in an effort to support the statement that ERISA does not display any particular interest in preserving benefits for any particular beneficiary. But that statement is simply wrong: The exact opposite is true. Ever since the enactment of REA, ERISA has exhibited an extraordinary interest in protecting the surviving spouse of the participant employee, going so far as to trump the participant employee's own beneficiary designation if, absent spousal consent, the designee is not the participant's surviving spouse. By statutory enactment, then, Congress has elected to designate for each and every participant in an ERISA plan precisely who the "natural objects of his or her bounty" must be. And, in making that election, Congress has opted to elevate the nonparticipant spouse (or, in the case of divorce, the nonparticipant ex-spouse) above such presumptive candidates as the descendants or other heirs, legatees or assigns of either spouse. In and of itself, this apparently arbitrary "prioritizing" might be viewed by some as an unusual federal intrusion into state marital property rights. But, if so, it is nevertheless an

---

29 U.S.C. § 1055(d).

The survivor beneficiary rules also apply to certain individual account plans unless, inter alia, the vested account balance is payable in full, upon the death of the participant, to the participant's surviving spouse. See 29 U.S.C. § 1055(b)(1). That a particular plan may be one of the plans excepted from these rules, however, would not affect the conclusion that ERISA preempts the Louisiana community property law claims at issue.

25

intrusion that Congress manifestly and expressly determined to be warranted─may, required─to accomplish the ends of ERISA. And that is the prerogative of Congress, not of the courts.

Thus ERISA's survivor annuity rules unquestionably established protection of spouses as the top priority under the statute. These provisions reinforce the conclusion that no heritable right exists in the heirs of a predeceased spouse, whether participant or nonparticipant, particularly when such right could act to deprive a surviving spouse of the benefits expressly granted by the statute.[60] Moreover, these provisions illuminate the fact that in the instant litigation neither First Spouse nor her heirs and legatees have any property interest whatsoever in the payments received or to be received by Surviving Spouse as a survivor annuitant. Any right in personam that First Spouse might have had with respect to survivor annuity payments was conditioned on her outliving Participant; and even then she would have received payments from the plan only for the duration of her life. When First Spouse died, her right to a survivor annuity evaporated.

Additionally, if Participant had thereafter remained single until his death, no survivor annuity would have existed at all. The survivor annuity payments made and to be made to Surviving Spouse are the result of federal law's automatically creating this

---

[60] Ironically, if the Sons' cause of action were allowed to prevail, it would give a nonparticipant spouse greater ability than that of the participant to designate third parties as plan beneficiaries. That a participant spouse could thus be "disinherited" without his or her consent, whereas a nonparticipant spouse could not, would be both inconsistent and incompatible with the purposes of both ERISA and REA.

brand new right as a consequence of her marriage to Participant ——
his second marriage.  Such a right has nothing whatsoever to do
with the community that previously existed between Participant and
First Spouse.  Thus, with respect to survivor annuity benefits of
Surviving Spouse, there is simply no property or personal interest
which First Spouse or her heirs can claim and no right of action
against Surviving Spouse as the statutorily recognized beneficiary
of the Bell Plan's survivor annuity.

REA's amendments to and augmentation of ERISA also reinforce
the constant refrain that "pensions are for the living."[61]  Both the
QDRO mechanism and the survivor annuity rules accomplish this clear
purpose of protecting a living dependent of the participant,
regardless of whether the participant himself is living or
deceased.  And Congress in its wisdom has designated the
nonparticipant spouse as the one among all of the employee's
potential "dependents" who is to be thus protected.  Again, in
addition to achieving national uniformity, the other central
purpose of ERISA is to protect pension benefits in the way best
calculated to provide retirement income to employees and their
living dependents —— especially their surviving spouses —— not to
provide, ensure, or preserve legacies or inheritances, or the
putative testamentary power of a nonparticipant spouse to alienate
an interest in plan benefits.  It seems certain to me that, when
properly analyzed, a cause of action that would allow the heirs or
legatees of a nonparticipant spouse to claim a state domestic

_____

[61]  Ablamis v. Roper, 937 F.2d 1450, 1457.

27

property law interest in benefits otherwise payable to the participant or his congressionally favored dependent(s) flies in the face of congressional intent and does "major damage" to the purposes of ERISA.[62]

4.   Anti-Alienation

Thus far I have examined ERISA preemption in relatively broad, conceptual terms, implicating primarily Congressional intent and statutory goals.  But one must also ask if there is not something specific in ERISA that must be upheld or enforced, through the exercise of preemption, to ensure the attainment of those goals while maintaining the integrity of the statute as a cohesive whole. The answer is "yes"; and in this case that "something" is ERISA's prohibition of alienation, its so-called "spendthrift" rules.  For, in ERISA's unique and complex structure, "anti-alienation" is an indispensable, load-bearing element, and the one specifically at issue in this case.  It is also key to understanding both the tension between ERISA and the community property provisions involved in this case, and the broader role of preemption as well.

ERISA's spendthrift provision unequivocally and unconditionally commands that "benefits provided under the plan may not be assigned or alienated."[63]  Similar to (but not congruent with) the trust law concept from which it was borrowed, ERISA's

---

[62]  Although in the instant case Participant married Surviving Spouse after the death of his First Spouse, I am satisfied that REA supports preemption in all cases, including situations in which the plan participant remains single.

[63]   29 U.S.C. § 1056(d)(1).

uniquely crafted spendthrift provision is designed to protect retirement income and all other pension benefits not only from the claims of creditors and other third parties (such as heirs and legatees), i.e.,"involuntary alienation," but from the participant's own foolishness and profligacy as well, i.e., "voluntary alienation." The Supreme Court has recognized that ERISA'S spendthrift provision "reflects a considered congressional policy choice to safeguard a stream of income for pensioners (and their dependents ...), even if that decision prevents others from securing relief for the wrongs done them."[64]

The district court concluded that "ERISA's anti-alienation provision does not operate to preempt Louisiana community property law."[65] I could not disagree more strongly: ERISA's anti-alienation rule is directly implicated in and "inextricably intertwined" with the instant circumstances.

The district court grounded that conclusion on what appears to be two fallacious premises. First, citing pre-REA case law, the court stated that Congress did not intend to alter familial and support obligations when it enacted the anti-alienation provision. Here, the district court's undoing is, again, its reliance on cases made obsolete by the enactment of REA. As discussed in detail above, REA amended ERISA for the express purpose of cleaning up the mess created by prior inconsistent and misapprehending

---

[64] Guidry v. Sheet Metal Workers National Pension Fund, 493 U.S. 365, 376 (1990).

[65] The court raised this anti-alienation argument sua sponte.

29

jurisprudence; REA created the unique concept of the QDRO and commissioned it to serve as the exclusive exception to anti-alienation.[66] Since the adoption of REA, it is only by obtaining a QDRO that the nonparticipant spouse or ex-spouse can avoid the spendthrift provisions of ERISA and have a community interest in an ERISA plan recognized.[67] The Sons do not argue, nor could they, that the QDRO requirements have been complied with in this case. The district court's first reason seems anachronistic at best, and clearly inapposite.

The second reason given by the district court for holding that the spendthrift provision is not implicated by the operation of Louisiana's community property law is that the First Spouse's interest was "acquired by her directly at the outset and did not represent a transfer to her of rights which had previously accrued to [Participant]." I see that pronouncement as simply irrelevant. Indeed, the relevant "transfer" inquiry is not whether the First Spouse acquired her interest by way of a transfer, but whether the Sons' causes of action depend on the efficacy of the attempted transfer ⸺ from First Spouse to the Sons ⸺ of her community interest in the plan. Obviously it does, and just as obviously her attempted alienation is proscribed by ERISA's spendthrift provision, making it a nullity.

---

[66] See 29 U.S.C. § 1056(d)(3).

[67] S. Rep. No. 98-575 at 19, reprinted in 1984 U.S.C.C.A.N. at 2565 ("The Committee believes that . . . the ERISA preemption provisions are necessary to ensure that only those orders that are excepted from the spendthrift provisions [i.e., QDROs] are not preempted.") (emphasis added).

30

The Sons' action in Louisiana state court seeks an accounting of their father's usufruct. Apparently without analysis, the Sons implicitly assume that, among the interests that were included in their mother's legacy to them of the naked ownership of two-thirds of her half of all community assets, was some fractional interest in their father's account in the Bell Plan. Based on that erroneous assumption, the Sons proceed to seek an accounting, plus a judicial recognition of an ownership interest in past and future Bell Plan benefits. The district court appears to have proceeded on the same flawed assumption, i.e., that the First Spouse's legacy to the Sons effected a <u>transfer</u> of, inter alia, her community interest in the Bell Plan.

But, given ERISA's ban on both voluntary and involuntary alienation, the First Spouse had no legal power, whether inter vivos or testamentary, to effectuate a transferSQan alienationSQof any interest in an ERISA plan. The Sons' asserted cause of action and the district court's reasoning presupposes that Participant's testamentary usufruct from First Spouse actually included an interest in Bell Plan retirement benefits. Yet he could not have received such an interest <u>from her</u> any more than could the Sons have received <u>from her</u> a naked ownership interest in the plan benefits. As ERISA's spendthrift provision absolutely bars alienation,[68] a bequest of a usufruct in the plan benefits would be a prohibited transfer, just as would a bequest of the naked ownership. It thus seems indisputable that one asset that the

---

[68]  <u>Ablamis v. Roper</u>, 937 F.2d 1450 (9th Cir. 1991).

31

testamentary usufruct never covered was the interest of the community in the Bell Plan or its benefits, regardless of the purported effects of the First Spouse's testament or her succession representative's treatment of such interests in her Louisiana succession.

Although not entirely clear, the Sons' asserted cause of action may also be grounded in the proposition that the Participant, as spouse, has an obligation to account for First Spouse's community property. Of course, as a designated beneficiary, Surviving Spouse would owe no such obligation to First Spouse's estate.[69] Thus, with respect to the cause of action against Surviving Spouse, this argument is simply irrelevant.

Framing the cause of action against Participant's estate as an obligation to account should not compel a different conclusion. In reality, the Sons' accounting action is a thinly disguised attempt to obtain ownership of "property" that they contend was bequeathed to or inherited by them. An absolute prerequisite of the heirs' right of action or standing to compel such an accounting, however, is that they have an interest in the property for which an accounting is sought. But, again, the Sons cannot have acquired such a prerequisite interest in these retirement benefits because

---

[69] A designated beneficiary is not a debtor of the old community. Thus, the proceeds of a retirement plan payable to a designated beneficiary, like the proceeds of an insurance policy payable to a designated beneficiary, are not subject to execution in satisfaction of the debts of the decedent or his estate, whether owed to the heirs of his deceased spouse or otherwise. In addition, as explained above, First Spouse and her heirs have no property interest whatsoever in survivor annuity benefits payable to Surviving Spouse.

ERISA's spendthrift provisions interdict absolutely any attempted alienation that is not in "qualified" form. Even a cursory reading of the requirements for qualifying as a QDRO reflects that neither intestate nor testamentary transfers can qualify. I thus believe that, as a matter of law, the premise on which the Sons' cause of action is based, i.e., one transfer from their mother to their father and a second, contemporaneous transfer from her to them, is non-existent.[70]

I therefore find inescapable the conclusion that ERISA's anti-alienation provision preempts those provisions of Louisiana community property law that are pertinent to this decision. As such, ERISA's proscription of transfer functioned to prevent the Sons — and, for that matter, Participant — from obtaining from First Spouse, by testament or otherwise, any interest in the share of the community's putative interest in Participant's retirement plan or its benefits claimed by the Sons. To reach this conclusion, I had to determine which law prevails, ERISA's "spendthrift" canon or Louisiana's community property law. In giving the nod to ERISA, I plainly recognize its preemptive effect. When, as here, some aspect of state law "relates to" an ERISA plan

---

[70] Proponents of the Sons' position contend that, because a spendthrift provision generally ceases to shield funds after they have been distributed from the trust, no violation of this provision has occurred in the instant case. This reasoning is unconvincing. The Sons' claims are inextricably tied to an attempted alienation of the benefits at a time when those benefits remained in the plan and could not be alienated. These claims are readily distinguishable from those of a creditor against the distributed benefits that are unrelated to an asserted ownership claim of the benefits themselves.

33

—— particularly when it directly conflicts with a key provision of ERISA, such as anti-alienation —— the latter trumps by virtue of preemption. Only through the terrible swift sword of preemption is the frustrating of Congress's announced goals trampled.

The QDRO is an exception to both statutory preemption in general and to anti-alienation in particular. It is therefore not surprising that both provisions are apposite to this case. Given both the posture of this case and its importance, however, I do not rest my conclusion exclusively on the anti-alienation provision. Assuming, but certainly not conceding, that the anti-alienation provision alone might not preclude the Sons' asserted cause of action, I remain convinced that the express statutory preemption provision surely does.

5. Civilian Sanctity Does Not Compel A Different Result

Louisiana's community regime is a time-honored Civilian institution; it is not, for example, the result of a belated effort of a common law state to obtain some federal tax advantage or parity. Notwithstanding the venerability of Louisiana's community property law and the implication of public policy that others might argue are embodied in some facets of that regime, I observe that in other areas of its private law, which are equally steeped in tradition and intertwined with public policy, Louisiana has carved out exceptions for ERISA-qualified employee benefit plans. For example, qualified plans are found on Louisiana's list of property that is exempt from claims of creditors in bankruptcy.[71] A more

_____

[71] La. Rev. Stat. Ann. §13:3881(D).

34

instructive example is found in the law of forced heirship, under which the decedent's interest in a qualified plan is exempt from claims of forced heirs[72] despite the fact that, at least until quite recently, no Civilian cow was more sacred in Louisiana.[73] Admittedly, there are distinguishing differences between these examples and the instant case, but they serve to illustrate that even under the Civil Law of Louisiana, ERISA-covered employee benefit plans are recognized as being sui generis and are frequently treated as such.[74]

But most of all, I cannot ignore the mandate of the federal statute, the intent of Congress, and the purposes and structure of ERISA. I therefore would have had this court conclude that ERISA — its expressed purposes and its particular provision against alienation — preempts Louisiana community property law to the extent that such law would recognize and enforce a probate interest of the heirs or legatees of a predeceased nonparticipant spouse in an ERISA-qualified pension plan. To hold otherwise would seem to

---

[72] La. Civ. Code Ann. art. 1505.

[73] See La. Const. art. XII, § 5 (amended 1995) ("[n]o law shall abolish forced heirship."); Succession of Lauga, 624 So.2d 1156 (La. 1993) (declaring legislative revamping of forced heirship law unconstitutional). But see La. Const. art. XII § 5 (effective November 23, 1995) (removing constitutional protection for forced heirship except for children under 23 years of age or disabled).

[74] Neither can I ignore the purely suppletive, non-mandatory nature of Louisiana's community property regime. Both before and during the marriage, a couple is entitled to select the marital property regime of their choice, including not only the community regime but also, inter alia, a regime of separate property that is essentially identical to the common law system. See La. Civ. Code Ann. art. 2336. I question just how sacrosanct a purely optional property system can be.

frustrate ERISA's ultimate purposes of providing nationally uniform governance of employee benefit law and ensuring receipt of retirement benefits by participating employees and their dependents.

6.  No "End Runs" to Defeat the Effects of Preemption

The Sons sought —— and have now obtained —— a result that is the equivalent of a decree of ownership of retirement benefits under an ERISA plan. In a thinly veiled effort to get around ERISA's anti-alienation bar, the Sons argue that an accounting, with recovery in the form of a money judgment, does not violate anti-alienation because the judgment would be payable from funds that have been distributed and commingled with other assets, and therefore no longer protected by the spendthrift provision's shield.

I have already demonstrated why such a result cannot be achieved by direct means: ERISA's anti-alienation provisions render nugatory the First Spouse's purported transfer of "her" community interest in the Bell Plan benefits. Anti-alienation thus interdicts any efforts by the Sons to compel a plan administrator to turn over to the Sons directly a portion of the benefits, simply by virtue of their status as heirs of a nonparticipant spouse.[75] And, I have also demonstrated that ERISA's preemption will enforce anti-alienation over the laws of the state that are here at work. I am satisfied that permitting the Sons to achieve the results they desire by indirect means is likewise proscribed.

_____

[75]  Ablamis v. Roper, 937 F.2d 1450 (9th Cir. 1991).

In other federal preemption contexts, the courts have stricken efforts to employ indirect means to circumvent or undermine federal law.[76] In the context of United States bonds, the Supreme Court stated that "[i]f the State can frustrate the parties' attempt to use the bonds' survivorship provision through the simple expedient of requiring the survivor to reimburse the estate of the deceased co-owner as a matter of law, the State has interfered directly with a legitimate exercise of the power of the Federal Government to borrow money."[77] Relying on that reasoning by analogy, at least one district court has recognized that what ERISA prohibits directly cannot be accomplished indirectly.[78] The extraordinary protections and policies embodied in ERISA could be emasculated to the point of impotence were they so easily circumvented by enforcing indirectly otherwise preempted claims or prohibited alienations under the guise of an accounting action or claim of inheritance rights against the plan beneficiary, or eventually the plan's fiduciary.

C

CONCLUSION

---

[76] See Free v. Bland, 369 U.S. 663 (1962) (holding that federal law creating a right of survivorship in United States Savings Bonds registered in co-ownership form preempted Texas community property law).

[77] Id. at 669.

[78] Meeks v. Tullis, 791 F.Supp. 154, 157 (W.D. La. 1992) (holding that a claim by the heirs of a nonparticipant spouse against non-ERISA assets for the value of the community property interest is preempted because to allow this claim would little different than allowing a claim to the ERISA assets, which is prohibited).

37

Based on the foregoing reasons, I am firmly convinced that ERISA preempts Louisiana community property law to the extent that such law would purport to recognize and enforce an interest of the heirs of a nonparticipant spouse in an ERISA-qualified pension plan. Whether the en banc court would have reached this same conclusion cannot be said. What can be said, however, is that the magnitude and importance of the issue presented by this case made it worthy of review by the entire court. I regret that a majority of my colleagues did not see it this way; that is why I respectfully dissent from the decision not to rehear this most important case en banc.