# IN THE SUPREME COURT OF IOWA

No. 22–1257

Submitted April 11, 2023—Filed May 5, 2023

**MARY KATHRYN C. WALLACE,**

Appellant,

vs.

**KRISTIN W. WILDENSEE** and **MARY KATHRYN C. WALLACE** as Executors of the **ESTATE OF DOUGLAS AYER WALLACE,**

Appellees.

---

Appeal from the Iowa District Court for Johnson County, Paul Miller, Judge.

A spouse appeals a district court's refusal to issue a domestic relations order in the absence of an underlying divorce or separate maintenance proceeding. **AFFIRMED.**

Christensen, C.J., delivered the opinion of the court, in which all justices joined.

Constance Peschang Stannard of Johnston, Stannard, Klesner, Burbidge & Fitzgerald, PLC, Iowa City, for appellant.

Hilary Strayer of Strayer Law Office, Iowa City, for appellees.

Sally Frank, Des Moines, for amicus curiae Drake Legal Clinic.

**CHRISTENSEN, Chief Justice.**

Mary Kathryn Wallace seeks to have her late husband's 401(k) profit-sharing plan transferred into her name although there is no corresponding domestic relations order. The plan at issue is governed by the Employee Retirement Income Security Act of 1974 (ERISA). To complete the transfer, ERISA requires the parties to obtain a qualified domestic relations order (QDRO) pursuant to Iowa domestic relations law. At the time a petition was filed in this matter, Mary Kathryn and Douglas Wallace were happily married and opposed to seeking a domestic relations order through divorce or separate maintenance proceedings. In the absence of a divorce or separate maintenance proceeding, the district court refused to grant the order based on a lack of statutory authority to do so. We agree. QDROs are not freestanding or independent legal actions. They are ancillary to and depend on a domestic relations matter. Thus, without a divorce or separate maintenance proceeding under Iowa Code chapter 598 (2022), Iowa district courts cannot enter QDROs for the sole purpose of transferring a plan covered by ERISA.

## I. Background Facts and Proceedings.

The Wallaces were married on July 22, 1961, and enjoyed a continuous and committed relationship throughout the years. They never entered into a prenuptial agreement and never filed for divorce, separate maintenance, or annulment. In May of 2021, they sought the services of a financial advisor to plan out the remainder of their retirement years. Their primary concern was to ensure living arrangements that suited both their individual and collective

needs. Douglas previously developed Parkinson's disease and needed full-time care; Mary Kathryn continued to live on her own, but she could not care for Douglas full-time. In order to accomplish their retirement goals, Douglas executed a power of attorney authorizing Mary Kathryn to act as his attorney-in-fact. The Wallaces' financial advisor agreed with that position and recommended transferring Douglas's 401(k) retirement plan into Mary Kathryn's name for long-term estate and tax planning purposes.

The Wallaces first attempted to transfer the plan in November 2021. They executed an interspousal agreement pursuant to Iowa Code chapter 597 and asked the district court to enforce it with a domestic relations order. The court denied their petition for three reasons: First, the interspousal agreement was not enforceable because it lacked consideration. Second, the court believed the Wallaces' petition did not present a case or controversy for it to decide. Finally, the court was not persuaded it had authority to enter a domestic relations order without a dissolution or separate maintenance action.

A few months later, the Wallaces filed a new petition.[1] They revised the interspousal agreement purporting to transfer Douglas's retirement plan to Mary Kathryn in exchange for $10. The Wallaces also submitted various affidavits and a proposed domestic relations order. Mary Kathryn represented herself, and Douglas was represented by an attorney. The district court held a hearing on the new action. Again, the court denied the request for a domestic relations order,

---

[1]Mary Kathryn signed the petition and interspousal agreement on her own behalf (petitioner), and she signed as attorney-in-fact for Douglas (respondent).

explaining it had no statutory authority to approve the interspousal agreement. After filing an unsuccessful motion to reconsider, the Wallaces filed a notice of appeal, and we retained the case.

On December 7, 2022, while this case was pending, Douglas passed away. Mary Kathryn and her daughter are coexecutors of Douglas's estate, so they filed a motion asking this court to substitute them as parties to represent the estate on this appeal. We granted the motion, and the parties filed one brief in support of reversing the district court. At our request, the Drake Legal Clinic prepared and filed an adversarial amicus brief to defend the district court's ruling. *See* Iowa R. App. P. 6.906(1).

**II. Standard of Review.**

"Review in equity cases shall be de novo." *Id.* r. 6.907.

**III. Analysis.**

**A. Potential Justiciability Issues Do Not Preclude Judicial Review.** Two potential justiciability doctrines might apply in this case, but neither one ultimately precludes our review. First, the ostensible lack of a case or controversy poses no obstacle here even though the parties both seek the same thing—a domestic relations order pursuant to Iowa domestic relations law. We see no reason to distinguish between this case and a stipulated divorce. *See In re Marriage of Jones*, 653 N.W.2d 589, 593 (Iowa 2002) (explaining the effect of stipulation in the context of a divorce).

Second, Douglas passed away while this case was on appeal. We assume without deciding that his death made this appeal moot. However, we reach the

merits by determining the public importance exception to the mootness doctrine applies. *See Riley Drive Ent. I, Inc. v. Reynolds*, 970 N.W.2d 289, 298 (Iowa 2022). If a moot case presents a question that has public importance and is likely to recur, we may, in our discretion, still decide to settle the question. *Id.* In exercising this discretion, we weigh four factors:

> (1) the private or public nature of the issue; (2) the desirability of an authoritative adjudication to guide public officials in their future conduct; (3) the likelihood of the recurrence of the issue; and (4) the likelihood the issue will recur yet evade appellate review.

*Id.* (quoting *Homan v. Branstad*, 864 N.W.2d 321, 330 (Iowa 2015)).

Because this case presents a problem that has public importance and is likely to arise again, we consider the four factors and conclude they weigh in favor of resolving this case. First, this case relates to public questions about state domestic relations law, property rights, marital agreements, and even elder abuse. Second, there is also a high degree of desirability for authoritative adjudication to guide district courts so the law is applied uniformly. Third, the issue is bound to arise again because Iowans with retirement plans are likely to pursue the financial incentives that a transfer might provide. And fourth, when the issue does arise again, it will evade review whenever a district court agrees to enter the domestic relations order because no party is aggrieved when the joint petition is granted.

**B. Background Legal Principles Relating to ERISA and QDROs.** Because "ERISA is an enormously complicated statute," we provide an overview of the statute, its spendthrift (or nonalienation) provision, and QDROs. *Wachtel v. Health Net, Inc.*, 482 F.3d 225, 237 (3d Cir. 2007). In 1974, Congress enacted

ERISA to regulate private pension plans in the United States. Employee Retirement Income Security Act of 1974, Pub. L. No. 93–406, 88 Stat. 829 (codified as amended in scattered sections of 26 U.S.C. and 29 U.S.C.). ERISA "prescribe[s] various disclosure and reporting requirements, participation and vesting standards, fiduciary obligations, criminal penalties, and civil enforcement provisions." *Am. Tel. & Tel. Co. v. Merry*, 592 F.2d 118, 120 (2d Cir. 1979) (footnotes omitted). ERISA was codified "through amendments to both the Federal Labor Code (Title 29 U.S.C.) and the Internal Revenue Code (Title 26 U.S.C.)." *Rohrbeck v. Rohrbeck*, 566 A.2d 767, 768 (Md. 1989).

"One of the key components of the act was the spend-thrift provision," which is sometimes referred to as the antialienation provision. *Bruns v. Iowa Dist. Ct.* (*In re Marriage of Bruns*), 535 N.W.2d 157, 161 (Iowa Ct. App. 1995) (en banc). Under that provision, plan participants are prohibited from assigning or alienating their plan benefits. *Id.* This prohibition's purpose is to protect retirement plan participants from their own improvidence and ensure they will have some financial support upon retirement. *Stinner v. Stinner*, 554 A.2d 45, 49 (Pa. 1989). As one federal court explained, ERISA "was aimed at guaranteeing the security of retirement income for American workers. This was achieved primarily through the vesting and funding requirements, but the additional safeguard of non-alienability of one's plan interest is no less important." *Smith v. Mirman* (*In re Mirman*), 749 F.2d 181, 184 (4th Cir. 1984).

Over time, questions developed about the meaning of the spendthrift provision. *See Baird v. Baird*, 843 S.W.2d 388, 391 (Mo. Ct. App. 1992). In the

family law context, some courts concluded that the provision did not preclude a court from dividing up "pension benefits to satisfy family support obligations" to a former spouse or dependent children. *Id.* For example, the United States Court of Appeals for the Second Circuit concluded the ERISA's spendthrift provision contained an "implied exception" that allowed a state court to garnish a plan participant's benefits to satisfy unmet alimony and child support obligations. *Am. Tel. & Tel. Co.*, 592 F.2d at 121. Relatedly, the spendthrift provision "often left women who worked in the home and contributed significantly to the family's financial security without the ability to obtain any pension benefits upon their husbands' death or upon divorce." *Ablamis v. Roper*, 937 F.2d 1450, 1453 (9th Cir. 1991).

Outside the context of family law, courts showed an unwillingness to find exceptions to the spendthrift provision. For example, the Fourth Circuit refused to allow a bankrupt plan participant to assign fully vested benefits during the time after the plan terminated but before the benefits were paid out. *Smith*, 749 F.2d at 181–82. The court reasoned that the spendthrift provision continued to govern the plan "throughout the processes of winding up and distribution." *Id.* at 181. Its decision was motivated by a fear of "eroding through exception the anti-alienation policy of ERISA" and "invit[ing] creditors to believe that ERISA funds are not, after all, inviolate." *Id.* at 184.

Against this backdrop, Congress enacted the Retirement Equity Act of 1984 to address the questions about the spendthrift provision's scope. Retirement Equity Act of 1984, Pub. L. No. 98–397, 98 Stat. 1426 (codified as

amended in scattered sections of 26 U.S.C. and 29 U.S.C.). "This Act amended ERISA to allow participants of a pension plan to alienate or assign benefits" through a QDRO. *Bruns,* 535 N.W.2d at 162. A QDRO is a domestic relations order that, among other things, recognizes an alternate person's right to receive plan benefits. 29 U.S.C. § 1056(d)(3)(B)(i), (C)–(D). ERISA then defines a domestic relations order as

> any judgment, decree, or order (including approval of a property settlement agreement) which—
>
> > (I) relates to the provision of child support, alimony payments, or marital property rights to a spouse, former spouse, child, or other dependent of a participant, and
> >
> > (II) is made pursuant to a State or Tribal domestic relations law (including a community property law).

*Id.* § 1056(d)(3)(B)(ii).

**C. Domestic Relation Orders Without a Divorce or Separate Maintenance Proceeding.** Mary Kathryn initially points to Iowa Code sections 597.3, 597.4, and 597.18 as the source of law that authorizes Iowa district courts to enter domestic relations orders. But in her reply brief, she also points to chapter 597 in its entirety. Either way, we ultimately disagree with Mary Kathryn's arguments. Under Iowa domestic relations law, a district court may enter a judgment, decree, or order only in the context of divorce or separate maintenance.

Mary Kathryn mistakes chapter 597 statutes, which secure rights to married couples, for chapter 598 statutes, which authorize district courts to issue domestic relations orders. The specific sections she cites are part of the

statutory scheme that put an end to common law coverture in Iowa.[2] *See Acuff v. Schmit*, 78 N.W.2d 480, 484–85 (Iowa 1956). None of those sections authorize district courts to enter a judgment, decree, or order.

Section 597.3 allows spouses to sue each other over property disputes in the same way that one could sue the other if they were not married. Iowa Code § 597.3; *see also Shook v. Crabb*, 281 N.W.2d 616, 619 (Iowa 1979) (en banc) ("Interspousal suits are not barred for the vindication of a property interest . . . ." (citations omitted)). Section 597.4, in turn, allows spouses to convey, transfer, and attach liens to property between themselves, as if they were not married. Iowa Code § 597.4; *see also Tollefsrud v. Tollefsrud* (*In re Est. of Tollefsrud*), 275 N.W.2d 412, 418 (Iowa 1979) (en banc) ("From this statute we infer a legislative intent that commercial dealings between spouses shall be given no different treatment than those between other parties."). And section 597.18 allows married individuals to make and enforce contracts and incur liabilities "to the same extent and in the same manner as" unmarried people. Iowa Code § 597.18; *see also Acuff*, 78 N.W.2d at 484 ("Section 597.18, Code 1851, permits a married woman to make contracts and enforce them the same, as if she were unmarried.").

These provisions do not allow district courts to enter judgments, decrees, or orders pursuant to domestic relations law. No other provision in chapter 597, whether taken alone or alongside surrounding provisions, gives Iowa district

---

[2]Coverture is the common law legal doctrine that, upon marriage, a woman's legal persona—and her accompanying legal rights—were subsumed into her husband. *Coverture*, *Black's Law Dictionary* 461 (11th ed. 2019); *id. Feme covert* at 763.

courts the right to enter judgments, decrees, or orders pursuant to Iowa domestic relations law. *See generally* Iowa Code §§ 597.1–.19. If a district court lacks authority to issue a judgment, decree, or order, it cannot act, even if both parties are in agreement. *Molitor v. City of Cedar Rapids*, 360 N.W.2d 568, 569 (Iowa 1985) ("[P]arties cannot confer jurisdiction by consent.").

The ERISA language "pursuant to a State . . . domestic relations law" imposes a meaningful restriction on QDROs. 29 U.S.C. § 1056(d)(3)(B)(ii)(II). Not every district court judgment, decree, or order relates to domestic relations law. Rather, "[d]omestic relations orders deal with household or family matters, which include divorce, separation, custody, support and adoption." *Ablamis*, 937 F.2d at 1456. Relatedly, the United States Supreme Court has explained, "[t]he QDRO provisions address the rights of divorced and separated spouses, and their dependent children, which are the traditional concern of domestic relations law." *Boggs v. Boggs*, 520 U.S. 833, 849 (1997). In this way, the requirement in ERISA section 1056(d)(3)(B)(ii)(II) is not satisfied when an Iowa district court enters a judgment, decree, or order that merely involves a married couple, their property, or both.

In order to be made pursuant to state domestic relations law, a district court order must have been authorized by a statute governing domestic relations law. For that reason, the only type of domestic relations orders that may currently qualify as QDROs are domestic relations orders issued under chapter 598. *See generally* Iowa Code chapter 598 ("Dissolution of Marriage and Domestic Relations."). Examples of domestic relations orders that chapter 598

authorizes are found in sections 598.21(1) ("Orders for disposition of property."), 598.21A ("Orders for spousal support."), 598.21B ("Orders for child support and medical support."), and 598.21C ("Modification of child, spousal, or medical support orders.").

Other jurisdictions' law supports this conclusion. In a strikingly similar case, *Jago v. Jago*, a married couple in Pennsylvania sought a QDRO to transfer funds from the husband's retirement plan to the wife's individual retirement account (IRA). 217 A.3d 289, 291 (Pa. Super. Ct. 2019). They did not intend to convert the money into the wife's separate property or otherwise partition the transferred funds. *Id.* at 291–92. The trial court initially approved their request and entered a QDRO to transfer $400,000; however, the plan administrator subsequently authorized the couple to transfer $700,000 into the wife's IRA. *Id.* The couple then asked the district court to amend the QDRO to transfer the increased amount, but it refused and vacated the initial QDRO. *Id.*

On appeal, the reviewing court affirmed the district court. *Id.* at 291. It explained, "[g]enerally, Pennsylvania courts enter QDROs in connection with a domestic relations matter." *Id.* at 295. It also emphasized the couple's acknowledgments that they did not intend to seek a divorce while echoing the district court's characterization of the couple's request: "The parties are asking the Court to rubberstamp a domestic relations order in the absence of a domestic relations dispute." *Id.* at 296. From this, the court concluded that "a QDRO is a procedural right derivative of or adjunct to a domestic relations matter, but outside the context of a domestic relations matter, a QDRO is not a distinct,

discrete legal claim." *Id.* at 297. Ultimately, the court held that, in the absence of a domestic relations matter such as a divorce, married couples "cannot obtain a QDRO for the sole purpose of moving funds in the . . . ERISA plan . . . to the non-participating spouse." *Id.*

In a somewhat different way, a Florida statute also supports our conclusion in this case. In Florida, district courts have the authority to order alimony and child support outside of divorce proceedings:

> If a person having the ability to contribute to the maintenance of his or her spouse and support of his or her minor child fails to do so, the spouse who is not receiving support may apply to the court for alimony and for support for the child without seeking dissolution of marriage, and the court shall enter an order as it deems just and proper.

Fla. Stat. § 61.09 (2022); *c.f. Baird*, 843 S.W.2d at 391–92 (reversing a district court that concluded it could not, despite authorization in section 452.140 of the 1986 Missouri Code, issue a domestic relations order that garnished a person's income for unpaid child support); *Taylor v. Taylor*, 541 N.E.2d 55, 58 (Ohio 1989) (concluding a now-repealed statute represented a state domestic relations law that allowed a court to enter a domestic relations order garnishing the income of a person with unpaid domestic support obligations). However, Iowa's domestic relations statutes do not appear to reflect the same policy choice. The parties have cited no authority that allows Iowa's district courts to enter domestic relations orders outside of the context of divorce or separate maintenance. Chapter 598, which governs dissolution of marriage and domestic relations, contains the only authority that the Iowa Code provides for a domestic relations court order. *C.f. Kahn v. Kahn*, 801 F. Supp. 1237, 1245 (S.D.N.Y. 1992), *aff'd,*

2 F.3d 403 (2d Cir. 1993) (citing New York Domestic Relations Law § 236(B)(2) (Consol. 2023), which limited the meaning of "matrimonial action" to annulments, dissolutions, divorces, legal separations, and declarations nullifying marriages).

Alternatively, Mary Kathryn asks us to reverse the district court on the grounds that affirming would violate the state's public policy of "preserving the marriage relationship." *Norris v. Norris*, 174 N.W.2d 368, 370 (Iowa 1970). Policy considerations may be relevant when assessing the enforceability of contracts. *See 33 Carpenters Constr., Inc. v. State Farm Life & Cas. Co.*, 939 N.W.2d 69, 81–82 (Iowa 2020) (collecting cases that hold contracts void and unenforceable on public policy grounds). But they are not relevant when we interpret unambiguous statutes. *See* Iowa Code § 4.6 (authorizing courts, if a statute is ambiguous, to consider the purpose of a statute, the circumstances of its enactment, the consequences of a particular construction, and legislative preambles or policy statements). More to the point, we cannot refuse to follow Iowa statutes for the sake of public policy because we sit on a court of law, not a court of public policy. *See Burrage v. United States*, 571 U.S. 204, 218 (2014) ("But in the last analysis, these always-fascinating policy discussions are beside the point. The role of this Court is to apply the statute as it is written . . . ."). If Iowa law in its current form offends a particular public policy, it is the legislature's prerogative and duty to correct the offense. *In re Est. of Whalen*, 827 N.W.2d 184, 194 (Iowa 2013) ("Policy arguments to amend the statute should be directed to the legislature.").

At the same time, the amicus brief persuades us that any potentially relevant policy considerations support the district court's decision. For example, asset transfers in other circumstances could amount to elder abuse, Iowa Code § 235F.1(5)(*a*)(4), or enable one spouse to financially exploit the other. Moreover, interspousal agreements may be compared to premarital agreements, but the Iowa Code does not impose protective restrictions on interspousal agreements like it does for premarital agreements. *See id.* § 596.8 (requiring enforceable premarital agreements to be voluntary, to be conscionable, and to fairly and reasonably disclose both spouses' assets). Setting aside the jurisdictional issues, these policy considerations support carefully scrutinizing interspousal agreements before approving them.

**D. Mary Kathryn's Equal Protection Rights Were Not Violated.** Mary Kathryn's last argument is that she has a state and federal equal protection right to obtain a QDRO through the enforcement of her interspousal agreement. We disagree. Under state and federal constitutional law, equal protection "is essentially a direction that all persons similarly situated should be treated alike." *Racing Ass'n of Cent. Iowa v. Fitzgerald*, 675 N.W.2d 1, 7 (Iowa 2004) (quoting *City of Cleburne v. Cleburne Living Ctr.,* 473 U.S. 432, 439 (1985)). In this case, there are no equal protection violations because all similarly situated groups are being treated the same way. *In re Det. of Morrow*, 616 N.W.2d 544, 548 (Iowa 2000) (en banc) ("To meet constitutional standards, it is sufficient if all members of the same class [are] treated the same.") (citing *Hack v. Auger*, 228 N.W.2d 42, 43 (Iowa 1975)). On the one hand, domestic relations orders are available to all

married couples on the condition of a divorce or separate maintenance proceeding. On the other hand, unmarried people are also all being treated equally: none of them can get domestic relations orders.

**IV. Conclusion.**

We affirm the district court for the reasons set out in this opinion.

**AFFIRMED.**